O'MELVENY & MYERS *v.* FEDERAL DEPOSIT IN-
SURANCE CORPORATION, AS RECEIVER FOR AMERI-
CAN DIVERSIFIED SAVINGS BANK, ET AL.

No. 93–489.   Argued March 21, 1994—Decided June 13, 1994

SCALIA, J., delivered the opinion for a unanimous Court. STEVENS, J., filed a concurring opinion, in which BLACKMUN, O'CONNOR, and SOUTER, JJ., joined, *post*, p. 90.

*Rex E. Lee* argued the cause for petitioner. With him on the briefs were *Robert D. McLean, Carter G. Phillips, Joseph R. Guerra, Peter D. Keisler, Richard D. Bernstein, Gregory R. Smith, Joseph M. Lipner,* and *Elliot Brown.*

*Deputy Solicitor General Bender* argued the cause for respondents. With him on the brief were *Solicitor General Days, James A. Feldman, Ann S. DuRoss, Richard J. Osterman,* and *Jerome A. Madden.*\*

JUSTICE SCALIA delivered the opinion of the Court.

The issue in this case is whether, in a suit by the Federal Deposit Insurance Corporation (FDIC) as receiver of a feder-

---

\*Briefs of *amici curiae* urging reversal were filed for Arthur Andersen & Co. et al. by *Carl D. Liggio, Kathryn A. Oberly, Jon N. Ekdahl, Harris J. Amhowitz, Howard J. Krongard, Edwin D. Scott,* and *Eldon Olson;* for Banking and Business Lawyers by *Keith R. Fisher, John C. Deal, David S. Willenzik, Neal L. Petersen, Henry H. Fox,* and *Michael J. Halloran;* and for Lee H. Henkel III by *Keith A. Jones.*

*C. Edward Simpson, Theodore H. Focht,* and *Michael E. Don* filed a brief for the Securities Investor Protection Corporation et al. as *amici curiae* urging affirmance.

Briefs of *amici curiae* were filed for the American Bar Association by *R. William Ide III, John J. Curtin, Jr.,* and *Arthur W. Leibold, Jr.;* and for Shrader & York et al. by *Eugene B. Wilshire, Jr.,* and *Patrick J. Dyer.*

ally insured bank, it is a federal-law or rather a state-law rule of decision that governs the tort liability of attorneys who provided services to the bank.

## I

American Diversified Savings Bank (ADSB or S&L) is a California-chartered and federally insured savings and loan. The following facts have been stipulated to, or are uncontroverted, by the parties to the case, and we assume them to be true for purposes of our decision. ADSB was acquired in 1983 by Ranbir Sahni and Lester Day, who respectively obtained 96% and 4% of its stock, and who respectively served as its chairman/CEO and president. Under their leadership, ADSB engaged in many risky real estate transactions, principally through limited partnerships sponsored by ADSB and its subsidiaries. Together, Sahni and Day also fraudulently overvalued ADSB's assets, engaged in sham sales of assets to create inflated "profits," and generally "cooked the books" to disguise the S&L's dwindling (and eventually negative) net worth.

In September 1985, petitioner O'Melveny & Myers, a Los Angeles-based law firm, represented ADSB in connection with two real estate syndications. At that time, ADSB was under investigation by state and federal regulators, but that fact had not been made public. In completing its work for the S&L, petitioner did not contact the accounting firms that had previously done work for ADSB, nor state and federal regulatory authorities, to inquire about ADSB's financial status. The two real estate offerings on which petitioner worked closed on December 31, 1985. On February 14, 1986, federal regulators concluded that ADSB was insolvent and that it had incurred substantial losses because of violations of law and unsound business practices. Respondent stepped

in as receiver for ADSB,[1] and on February 19, 1986, filed suit against Messrs. Sahni and Day in Federal District Court, alleging breach of fiduciary duty and, as to Sahni, Racketeer Influenced and Corrupt Organizations Act violations. Soon after taking over as receiver, respondent began receiving demands for refunds from investors who claimed that they had been deceived in connection with the two real estate syndications. Respondent caused ADSB to rescind the syndications and to return all of the investors' money plus interest.

On May 12, 1989, respondent sued petitioner in the United States District Court for the Central District of California, alleging professional negligence and breach of fiduciary duty. The parties stipulated to certain facts and petitioner moved for summary judgment, arguing that (1) it owed no duty to ADSB or its affiliates to uncover the S&L's own fraud; (2) that knowledge of the conduct of ADSB's controlling officers must be imputed to the S&L, and hence to respondent, which, as receiver, stood in the shoes of the S&L; and (3) that respondent was estopped from pursuing its tort claims against petitioner because of the imputed knowledge. On May 15, 1990, the District Court granted summary judgment, explaining only that petitioner was "entitled to judgment in its favor . . . as a matter of law." The Court of Appeals for the Ninth Circuit reversed, on grounds that we shall discuss below. 969 F. 2d 744 (1992). Petitioner filed a petition for writ of certiorari, which we granted. 510 U. S. 989 (1993).

---

[1] For simplicity's sake, we refer to a "receiver" throughout, which we identify as the FDIC. The reality was more complicated. The first federal entity involved was the Federal Savings and Loan Insurance Corporation (FSLIC), which was appointed conservator of ADSB in 1986 and receiver in June 1988. The Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. 101–73, 103 Stat. 183, abolished FSLIC, and caused FDIC, the manager of the FSLIC resolution fund, to be substituted as receiver and party to this case. See id., §§ 215, 401(a)(1), 401(f)(2).

## II

It is common ground that the FDIC was asserting in this case causes of action created by California law. Respondent contends that in the adjudication of those causes of action (1) a federal common-law rule and not California law determines whether the knowledge of corporate officers acting against the corporation's interest will be imputed to the corporation; and (2) even if California law determines the former question, federal common law determines the more narrow question whether knowledge by officers so acting will be imputed to the FDIC when it sues as receiver of the corporation.[2]

The first of these contentions need not detain us long, as it is so plainly wrong. "There is no federal general common law," *Erie R. Co.* v. *Tompkins*, 304 U. S. 64, 78 (1938), and (to anticipate somewhat a point we will elaborate more fully in connection with respondent's second contention) the remote possibility that corporations may go into federal receivership is no conceivable basis for adopting a special federal common-law rule divesting States of authority over the entire law of imputation. See *Bank of America Nat. Trust & Sav. Assn.* v. *Parnell*, 352 U. S. 29, 33–34 (1956). The Ninth Circuit believed that its conclusion on this point was in harmony with *Schacht* v. *Brown*, 711 F. 2d 1343 (CA7 1983), *Cenco Inc.* v. *Seidman & Seidman*, 686 F. 2d 449 (CA7 1982), and *In re Investors Funding Corp. of N. Y. Securities Litigation*, 523 F. Supp. 533 (SDNY 1980), 969 F. 2d, at 750, but even a cursory examination of those cases shows the contrary. In *Cenco*, where the cause of action similarly arose under state common law, the Seventh Circuit's analysis of

---

[2] The Court of Appeals appears to have agreed with the first of these contentions. Instead of the second, however, it embraced the proposition that federal common law prevents the attributed knowledge of corporate officers acting against the corporation's interest from being used as the basis for an estoppel defense against the FDIC as receiver. Since there is nothing but a formalistic distinction between this argument and the second one described in text, we do not treat it separately.

the "circumstances under which the knowledge of fraud on the part of the plaintiff's directors [would] be imputed to the plaintiff corporation [was] merely an attempt to divine how Illinois courts would decide that issue." *Schacht, supra,* at 1347 (citing *Cenco, supra,* at 455). Likewise, in *Investors Funding,* the District Court analyzed the potential affirmative defenses to the state-law claims by applying "[t]he controlling legal principles [of] New York law." 523 F. Supp., at 540. In *Schacht,* the Seventh Circuit expressly noted that "the cause of action [at issue] arises under RICO, a federal statute; we therefore write on a clean slate and may bring to bear federal policies in deciding the estoppel question." 711 F. 2d, at 1347.

In seeking to defend the Ninth Circuit's holding, respondent contends (to quote the caption of its argument) that "The Wrongdoing Of ADSB's Insiders Would Not Be Imputed To ADSB Under Generally Accepted Common Law Principles," Brief for Respondent 12—in support of which it attempts to show that nonattribution to the corporation of dishonest officers' knowledge is the rule applied in the vast bulk of decisions from 43 jurisdictions, ranging from Rhode Island to Wyoming. See, *e. g., id.,* at 21–22, n. 9 (distinguishing, *inter alia, Cook* v. *American Tubing & Webbing Co.,* 28 R. I. 41, 65 A. 641 (1905), and *American Nat. Bank of Powell* v. *Foodbasket,* 497 P. 2d 546 (Wyo. 1972)). The supposed relevance of this is set forth in a footnote: "It is our position that federal common law does govern this issue, but that the content of the federal common law rule corresponds to the rule that would independently be adopted by most jurisdictions." Brief for Respondent 15, n. 3. If there were a federal common law on such a generalized issue (which there is not), we see no reason why it would necessarily conform to that "independently . . . adopted by most jurisdictions." But the short of the matter is that California law, not federal law, governs the imputation of knowledge to corporate victims of

alleged negligence, and that is so whether or not California chooses to follow "the majority rule."

We turn, then, to the more substantial basis for the decision below, which asserts federal pre-emption not over the law of imputation generally, but only over its application to the FDIC suing as receiver. Respondent begins its defense of this principle by quoting *United States* v. *Kimbell Foods, Inc.*, 440 U. S. 715, 726 (1979), to the effect that "federal law governs questions involving the rights of the United States arising under nationwide federal programs." But the FDIC is not the United States, and even if it were we would be begging the question to assume that it was asserting its *own* rights rather than, as receiver, the rights of ADSB. In any event, knowing whether "federal law governs" in the *Kimbell Foods* sense—a sense which includes federal adoption of state-law rules, see *id.*, at 727–729—does not much advance the ball. The issue in the present case is whether the California rule of decision is to be applied to the issue of imputation or displaced, and if it *is* applied it is of only theoretical interest whether the basis for that application is California's own sovereign power or federal adoption of California's disposition. See *Boyle* v. *United Technologies Corp.*, 487 U. S. 500, 507, n. 3 (1988).

In answering the central question of displacement of California law, we of course would not contradict an explicit federal statutory provision. Nor would we adopt a court-made rule to supplement federal statutory regulation that is comprehensive and detailed; matters left unaddressed in such a scheme are presumably left subject to the disposition provided by state law. See *Northwest Airlines, Inc.* v. *Transport Workers*, 451 U. S. 77, 97 (1981); *Milwaukee* v. *Illinois*, 451 U. S. 304, 319 (1981). Petitioner asserts that both these principles apply in the present case, by reason of 12 U. S. C. § 1821(d)(2)(A)(i) (1988 ed., Supp. IV), and the comprehensive legislation of which it is a part, the Financial Institutions

Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Pub. L. 101–73, 103 Stat. 183.

Section 1821(d)(2)(A)(i), which is part of a title captioned "Powers and duties of [the FDIC] as . . . receiver," states that "the [FDIC] shall, . . . by operation of law, succeed to— all rights, titles, powers, and privileges of the insured depository institution . . . ." 12 U. S. C. § 1821(d)(2)(A)(i) (1988 ed., Supp. IV). This language appears to indicate that the FDIC as receiver "steps into the shoes" of the failed S&L, cf. *Coit Independence Joint Venture* v. *FSLIC,* 489 U. S. 561, 585 (1989), obtaining the rights *"of* the insured depository institution" that existed prior to receivership. Thereafter, in litigation by the FDIC asserting the claims *of* the S&L— in this case California tort claims potentially defeasible by a showing that the S&L's officers had knowledge—"'any defense good against the original party is good against the receiver.'" 969 F. 2d, at 751 (quoting *Allen* v. *Ramsay,* 179 Cal. App. 2d 843, 854, 4 Cal. Rptr. 575, 583 (1960)).

Respondent argues that § 1821(d)(2)(A)(i) should be read as a *nonexclusive* grant of rights to the FDIC receiver, which can be supplemented or modified by federal common law; and that FIRREA as a whole, by demonstrating the high federal interest in this area, confirms the courts' authority to promulgate such common law. This argument is demolished by those provisions of FIRREA which specifically create special federal rules of decision regarding claims by, and defenses against, the FDIC as receiver. See 12 U. S. C. § 1821(d)(14) (1988 ed., Supp. IV) (extending statute of limitations beyond period that might exist under state law); §§ 1821(e)(1), (3) (precluding state-law claims against the FDIC under certain contracts it is authorized to repudiate); § 1821(k) (permitting claims against directors and officers for gross negligence, regardless of whether state law would require greater culpability); § 1821(d)(9) (excluding certain state-law claims against FDIC based on oral agreements by the S&L). *Inclusio unius, exclusio alterius.* It is hard to

avoid the conclusion that § 1821(d)(2)(A)(i) places the FDIC in the shoes of the insolvent S&L, to work out its claims under state law, except where some provision in the extensive framework of FIRREA provides otherwise. To create additional "federal common-law" exceptions is not to "supplement" this scheme, but to alter it.

We have thought it necessary to resolve the effect of FIRREA because respondent argued that the statute not only did not prevent but positively authorized federal common law. We are reluctant to rest our judgment on FIRREA alone, however, since that statute was enacted into law in 1989, while respondent took over as receiver for ADSB in 1986. The FDIC is willing to "assume . . . that FIRREA would have taken effect in time to be relevant to this case," Brief for Respondent 35, n. 21, but it is not self-evident that that assumption is correct. See *Landgraf* v. *USI Film Products*, 511 U. S. 244, 268–270, 274 (1994); cf. *id.*, at 290–291 (SCALIA, J., concurring in judgment). It seems to us imprudent to resolve the retroactivity question without briefing, and inefficient to pretermit the retroactivity issue on the basis of the FDIC's concession, since that would make our decision of limited value in other cases. As we proceed to explain, even assuming the inapplicability of FIRREA this is not one of those cases in which judicial creation of a special federal rule would be justified.

Such cases are, as we have said in the past, "few and restricted," *Wheeldin* v. *Wheeler*, 373 U. S. 647, 651 (1963), limited to situations where there is a "significant conflict between some federal policy or interest and the use of state law." *Wallis* v. *Pan American Petroleum Corp.*, 384 U. S. 63, 68 (1966). Our cases uniformly require the existence of such a conflict as a precondition for recognition of a federal rule of decision. See, *e. g.*, *Kamen* v. *Kemper Financial Services, Inc.*, 500 U. S. 90, 98 (1991); *Boyle, supra,* at 508; *Kimbell Foods*, 440 U. S., at 728. Not only the permissibility but also the scope of judicial displacement of state rules

turns upon such a conflict. See, *e. g., Kamen, supra,* at 98; *Boyle, supra,* at 508. What is fatal to respondent's position in the present case is that it has identified *no* significant conflict with an identifiable federal policy or interest. There is not even at stake that most generic (and lightly invoked) of alleged federal interests, the interest in uniformity. The rules of decision at issue here do not govern the primary conduct of the United States or any of its agents or contractors, but affect only the FDIC's rights and liabilities, as receiver, with respect to primary conduct on the part of private actors that has already occurred. Uniformity of law might facilitate the FDIC's nationwide litigation of these suits, eliminating state-by-state research and reducing uncertainty—but if the avoidance of those ordinary consequences qualified as an identifiable federal interest, we would be awash in "federal common-law" rules. See *United States* v. *Yazell,* 382 U. S. 341, 347, n. 13 (1966).

The closest respondent comes to identifying a specific, concrete federal policy or interest that is compromised by California law is its contention that state rules regarding the imputation of knowledge might "deplet[e] the deposit insurance fund," Brief for Respondent 32. But neither FIRREA nor the prior law sets forth any anticipated level for the fund, so what respondent must mean by "depletion" is simply the forgoing of *any* money which, under any *conceivable* legal rules, might accrue to the fund. That is a broad principle indeed, which would support not just elimination of the defense at issue here, but judicial creation of new, "federal-common-law" causes of action to enrich the fund. Of course we have no authority to do that, because there is no federal policy that the fund should always win. Our cases have previously rejected "more money" arguments remarkably similar to the one made here. See *Kimbell Foods, supra,* at 737–738; *Yazell, supra,* at 348; cf. *Robertson* v. *Wegmann,* 436 U. S. 584, 593 (1978).

Even less persuasive—indeed, positively probative of the dangers of respondent's facile approach to federal-common-law-making—is respondent's contention that it would "disserve the federal program" to permit California to insulate "the attorney's or accountant's malpractice," thereby imposing costs "on the nation's taxpayers, rather than on the negligent wrongdoer." Brief for Respondent 32. By presuming to judge what constitutes malpractice, this argument demonstrates the runaway tendencies of "federal common law" untethered to a genuinely identifiable (as opposed to judicially constructed) federal policy. What sort of tort liability to impose on lawyers and accountants in general, and on lawyers and accountants who provide services to federally insured financial institutions in particular, "'involves a host of considerations that must be weighed and appraised,'" *Northwest Airlines, Inc.*, 451 U. S., at 98, n. 41 (quoting *United States* v. *Gilman*, 347 U. S. 507, 512–513 (1954))—including, for example, the creation of incentives for careful work, provision of fair treatment to third parties, assurance of adequate recovery by the federal deposit insurance fund, and enablement of reasonably priced services. Within the federal system, at least, we have decided that that function of weighing and appraising "'is more appropriately for those who write the laws, rather than for those who interpret them.'" *Northwest Airlines, supra*, at 98, n. 41 (quoting *Gilman, supra*, at 513).

We conclude that this is not one of those extraordinary cases in which the judicial creation of a federal rule of decision is warranted. As noted earlier, the parties are in agreement that if state law governs it is the law of California; but they vigorously disagree as to what that law provides. We leave it to the Ninth Circuit to resolve that point. The judgment is reversed and the case remanded for proceedings consistent with this opinion.

*So ordered.*

JUSTICE STEVENS, with whom JUSTICE BLACKMUN, JUSTICE O'CONNOR, and JUSTICE SOUTER join, concurring.

While I join the Court's opinion, I add this comment to emphasize an important difference between federal courts and state courts. It would be entirely proper for a state court of general jurisdiction to fashion a rule of agency law that would protect creditors of an insolvent corporation from the consequences of wrongdoing by corporate officers even if the corporation itself, or its shareholders, would be bound by the acts of its agents. Indeed, a state court might well attach special significance to the fact that the interests of taxpayers as well as ordinary creditors will be affected by the rule at issue in this case. Federal courts, however, "unlike their state counterparts, are courts of limited jurisdiction that have not been vested with open-ended lawmaking powers." *Northwest Airlines, Inc.* v. *Transport Workers*, 451 U. S. 77, 95 (1981). Because state law provides the basis for respondent FDIC's claim, that law also governs both the elements of the cause of action and its defenses. Unless Congress has otherwise directed, the federal court's task is merely to interpet and apply the relevant rules of state law.

Cases like this one, however, present a special problem. They raise issues, such as the imputation question here, that may not have been definitively settled in the state jurisdiction in which the case is brought, but that nevertheless must be resolved by federal courts. The task of the federal judges who confront such issues would surely be simplified if Congress had provided them with a uniform federal rule to apply. As matters stand, however, federal judges must do their best to estimate how the relevant state courts would perform their lawmaking task, and then emulate that sometimes . purely hypothetical model. The Court correctly avoids any suggestion about how the merits of the imputation issue should be resolved on remand or in similar cases that may arise elsewhere. "The federal judges who deal

regularly with questions of state law in their respective districts and circuits are in a better position than we to determine how local courts would dispose of comparable issues." *Butner* v. *United States,* 440 U. S. 48, 58 (1979).