Bruce G. MURPHY, Appellant,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for Southeast Bank, N.A., Appellee.

Nos. 93–5268, 93–5412.

United States Court of Appeals, District of Columbia Circuit.

Argued April 7, 1995.

Decided Aug. 1, 1995.

Rehearing and Suggestion for Rehearing In Banc Denied Oct. 4, 1995.

Bruce G. Murphy, pro se, argued the cause and filed the briefs as appellant.

John P. Parker, Sr. Atty., F.D.I.C., Washington, DC, argued the cause, for appellee. With him on the brief was Ann S. DuRoss, Asst. Gen. Counsel, and Colleen J. Bombardier, Sr. Counsel, F.D.I.C., Washington, DC. Claire L. McGuire and David A. Felt, Attys., F.D.I.C., Washington, DC, entered appearances.

Before: EDWARDS, Chief Judge; WALD and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

Bruce Murphy, an investor in an unsuccessful real estate venture, seeks damages from the FDIC on the theory that the failed bank that financed the venture, of which the FDIC is the receiver, was responsible for his loss. The district court granted summary judgment in favor of the FDIC upon the ground that the appellant's claims are barred both by federal common law, *see D'Oench, Duhme & Co., Inc. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), and by 12 U.S.C. § 1823(e). We hold that (1) § 1823(e) does not bar Murphy's claims because the FDIC has not demonstrated, as required by that statute, that the FDIC's interest in a specific asset would be diminished if the claims were upheld; and (2) the Supreme Court's recent decision in *O'Melveny & Myers v. FDIC*, —— U.S. ——, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994), removes the federal common law *D'Oench* doctrine as a separate bar to such claims. We therefore reverse the district court and remand the case for further proceedings.

## I. BACKGROUND

In his complaint Murphy tells the following story (which we take as true for the purpose of this appeal). In 1989 he paid approximately $515,000 for one "partnership unit" in the Orchid Island Associates Limited Partnership, which was then in the process of developing the Orchid Island Golf and Beach Club near Vero Beach, Florida. The investment contract guaranteed that he would receive a "6.1 multiple return on investment" but to date he has received nothing.

Southeast Bank, N.A. was the lead lender for the Orchid Island project. In the late 1980's and early 1990's the bank made several loans to the partnership, in a total amount approximating $50 million. Southeast was also involved in a plan whereby Orchid would engage in a public bond offering to raise additional funds in order to complete the project. Pursuant to that plan, Orchid would take a "bridge loan" from Southeast to cover expenses until the bonds were sold, and the proceeds from the bond offering would be used both to repay the bridge loan and to reduce the amounts outstanding on Southeast's earlier loans. When Southeast informed Orchid's other lenders that the proposed bond financing would result in a lien on the project superior to theirs, however, they rejected the proposal and the deal fell through. Orchid subsequently defaulted on its loan obligations, and Southeast foreclosed upon the property. Shortly thereafter Southeast was itself declared insolvent, the FDIC was appointed receiver of the bank, and Murphy filed this lawsuit.

Although somewhat vague, the gravamen of Murphy's claim is that the bank effectively controlled Orchid and thus assumed the role, and the corresponding legal duties, of a joint venturer or partner. Murphy contends that the bank is therefore responsible for various misdeeds allegedly committed by Orchid officials, including: "failure to register securities" (count 3); "unlawful offer and sale of securities" (count 4); "breach of fiduciary duties" (count 5); "breach of contract" (count 6); and "accounting" improprieties (count 7).

Murphy further contends that, in its role as promoter of the aborted bond offering, the bank itself engaged in "fraud" (count 8) and made "negligent misrepresentation[s]" (count 9). In addition, Murphy complains that the FDIC has failed to establish alternative dispute resolution (ADR) procedures, as required by statute, and therefore has improperly denied him the opportunity to pursue his claim through an ADR channel (counts 1 and 2). Murphy seeks money damages (in counts 3–6 and 8–9), and an order requiring the FDIC to give him certain accounting statements (count 7) and to adopt ADR procedures and apply them to his claim (counts 1–2).

Each of the loan agreements between Orchid and the bank contains a provision to the following effect: "The Lender is a lender only and shall not be considered a shareholder, joint venturer or partner of the Borrower." Relying upon those written provisions, Murphy's inability to point to any written agreement that supports his joint-venture theory of liability, the federal common law *D'Oench* doctrine, and 12 U.S.C. § 1823(e), the district court granted summary judgment in favor of the FDIC on counts 3 through 9. The district court also granted summary judgment in favor of the FDIC on the first two counts, holding that, under the governing statute, the FDIC has the discretion to decide whether to adopt an ADR procedure and, if it does so, whether a particular claim is suitable therefor.

## II. ANALYSIS

Murphy raises distinct substantive and procedural points before this court. First, he argues that 12 U.S.C. § 1823(e) does not apply to his substantive claims and that the recent Supreme Court decision in *O'Melveny & Myers v. FDIC* makes clear that the federal common law *D'Oench* doctrine has been displaced by a federal statute. Second, he renews his claim that the FDIC is required to establish an ADR procedure and to apply it to his claim.

### A. *12 U.S.C. § 1823(e)*

In 1950, eight years after the Supreme Court decided *D'Oench*, the Congress enacted the Federal Deposit Insurance Act, 12 U.S.C. § 1811 *et seq.*, which "bars anyone from asserting against the FDIC any agreement not properly recorded in the records of the bank that would diminish the value of an asset held by the FDIC." *E.I. du Pont de Nemours & Co. v. FDIC*, 32 F.3d 592, 596 (D.C.Cir.1994). That provision, as modified in 1989 by the Financial Institutions Reform, Recovery, and Enforcement Act, Pub.L. No. 101–73, 103 Stat. 183 (better known as the FIRREA), currently provides that:

> No agreement which tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the [FDIC] unless such agreement—
>
> (A) is in writing,
>
> (B) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
>
> (C) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
>
> (D) has been, continuously, from the time of its execution, an official record of the depository institution.

12 U.S.C. § 1823(e)(1). The Congress further provided in the FIRREA that "any agreement which does not meet the requirements set forth in section 1823(e) of this title shall not form the basis of, or substantially comprise, a claim against the [FDIC]." 12 U.S.C. § 1821(d)(9)(A).

By their terms, these statutory provisions bar any claim that (1) is based upon an agreement that is *either* (a) unwritten *or* (b) if in writing, does not meet the stringent requirements of §§ 1823(e)(1)(B)–(D), *and* (2) would diminish or defeat the interest of the FDIC in an asset acquired by it in its capacity as receiver of a failed depository institution. Murphy concedes that his claims

(save one) are (1) premised upon the existence of an unwritten joint-venture agreement between the bank and Orchid, but argues that § 1823(e) does not bar his claims because (2) the FDIC has failed to demonstrate that its interest in any specific asset assigned from Southeast would be diminished were he to prevail. He points out that he is not a borrower (or "obligor" per the statute) attempting to avoid payment of a loan owed to Southeast Bank but is rather an investor in a failed business venture in which, he claims, the failed bank was a culpable participant. To be sure, Murphy's claims, if successful, would diminish the value of the bank in the hands of the FDIC but that, according to Murphy, is not sufficient to meet the "asset" requirement of § 1823(e). We agree.

We recently held that § 1823(e)(1) is "applicable only to cases involving a specific asset, usually a loan, which in the ordinary course of business would be recorded and approved by the bank's loan committee or board of directors" and that "the requirements of § 1823(e) effectively limit that provision to conventional loan transactions." *du Pont*, 32 F.3d at 597. That interpretation gains support from subsection (C) of § 1823(e)(1), which specifically requires that, if a suit is to go forward, the agreement upon which it is based must have been approved by "the board of directors of [the bank] or its loan committee." *See In Re NBW Commercial Paper Litigation*, 826 F.Supp. 1448, 1463–64 (D.D.C.1992) (§ 1823(e) applies primarily to loan transactions). An agreement that does not involve an extension of credit would not ordinarily be submitted to the board or to a loan committee for approval. Moreover, while any agreement to make a significant loan will ordinarily meet the exacting requirements of § 1823(e), *see Langley v. FDIC*, 484 U.S. 86, 92, 108 S.Ct. 396, 401, 98 L.Ed.2d 340 (1987) (requirements of § 1823(e) "ensure mature consideration of unusual loan transactions by senior bank officials"), those requirements will almost never be met by an agreement between the bank and an investor, a trade creditor, or most clearly, a tort claimant (such as Murphy is, at bottom). Without so much as a "hint in any of Congress' pronouncements that such individuals should be disfavored," *du Pont*, 32

F.3d at 597 (quoting *NBW*, 826 F.Supp. at 1463), it would be positively wanton for a court to construe the asset requirement so broadly as to destroy their otherwise valid claims.

Even if we assume for the sake of argument that the asset requirement of § 1823(e) is so undemanding that § 1823(e) is a defense to any claim that would diminish the FDIC's interest in any asset that it has acquired from a failed bank, including an asset other than a loan, Murphy's claims would still survive. The FDIC does not point to an interest in any specific asset of any type that would be diminished by Murphy's claims. Indeed, the FDIC does not even respond directly to Murphy's assertion that its interest in no specific asset would be diminished, preferring instead to argue only that other courts have applied the federal common law *D'Oench* doctrine to bar claims that would not diminish its interest in a specific asset. That response not only fails to speak to the proper interpretation of the asset requirement of § 1823(e), it amounts to a near concession that the statute does not bar Murphy's claims and that if the FDIC is to find any refuge it must be in federal common law.

In a footnote to its brief the FDIC does observe that its "recovery from the loan transactions would clearly be diminished by any liabilities arising out of the same transactions." That statement could charitably be read implicitly to argue that the loans that Southeast made to Orchid are the specific assets in which the FDIC's interest would be diminished by Murphy's claims. If that is the FDIC's argument, however, then we find it singularly unconvincing. The value of the loans themselves would be diminished not at all by Murphy's claims. The FDIC may collect those loans or execute upon the property securing them to the same extent regardless whether Murphy prevails upon his damage claims. Only the overall value of the bankrupt's estate, not the receiver's interest in any specific asset, would be diminished if Murphy were to prevail.

Because the FDIC has failed to demonstrate that any specific asset—let alone a

specific asset "which in the ordinary course of business would be recorded and approved by the bank's loan committee or board of directors," *du Pont,* 32 F.3d at 597—would be diminished were Murphy to succeed, we reverse the judgment of the district court (which did not discuss the specific asset requirement in holding that § 1823(e) bars Murphy's claims). Although the FDIC does not rely separately upon § 1821(d)(9)(A), the statutory cousin of § 1823(e), we note also that that section simply "incorporates by reference the requirements of § 1823(e)," including the asset requirement, *du Pont,* 32 F.3d at 597, and therefore can not provide an independent ground for judgment in favor of the FDIC.

### B. *Federal common law: herein of* D'Oench, Duhme & Co.

■ The *D'Oench* case involved a securities dealer who had sold certain bonds to a bank insured by the FDIC. The issuer later defaulted on the bonds. In order to allow the bank to avoid carrying past due bonds on its books, the securities dealer executed unconditional notes in the amount of the bonds, pursuant (the dealer alleged) to a secret side agreement that the bank would not call the notes for payment. When the bank failed, however, the FDIC was appointed receiver and it demanded payment of the notes. The Supreme Court held that to allow the securities dealer to rely upon the secret agreement as a defense to payment of its note would violate the policy behind the Federal Reserve Act, *viz.* "to protect [the FDIC], and the public funds which it administers, against misrepresentations as to the securities or other assets in the portfolios of the banks which [the FDIC] insures." 315 U.S. at 457, 62 S.Ct. at 679.

Thus was born the federal common law doctrine that courts have since expanded "beyond the paradigm in which a debtor seeks to assert a defense to liability on a note held by the FDIC" to bar a variety of both claims made and affirmative defenses raised against the FDIC as receiver. *See du Pont,* 32 F.3d at 597–99 (and cases cited therein). Indeed, in the instant case the district court held that the *D'Oench* doctrine extends to

(and therefore bars) Murphy's substantive claim that the bank by its actions assumed the liabilities of a joint-venturer because that theory of liability contradicts the written agreements between the bank and Orchid in the records of the bank.

Although various circuits, including this one, have had occasion to apply the common law *D'Oench* doctrine since the passage of the FIRREA in 1989, Murphy argues that the Supreme Court's recent decision in *O'Melveny & Myers* now makes clear that the common law doctrine was preempted by that statute. To be sure, in *O'Melveny & Myers* the Supreme Court does not flatly state that *D'Oench* has been preempted by the FIRREA, but it does set forth some more general propositions that, we think, lead ineluctably to that conclusion.

In *O'Melveny & Myers* the FDIC, as receiver of a California savings bank, sued a law firm that had performed services for the bank; it claimed that the firm had been negligent and had breached its fiduciary duty by failing to uncover the wrongdoing of certain officers of the bank. —— U.S. at ——, 114 S.Ct. at 2052. The district court entered summary judgment in favor of the law firm, apparently upon the ground that under California law knowledge of the employees' misconduct is imputed to the employer—and thence to the FDIC as receiver in the employer's stead. *Id.* The FDIC argued that the question whether to impute knowledge of a bank employee's conduct to the FDIC is governed not by California law but by federal common law. *Id.* The Supreme Court unanimously rejected that contention, holding that the FIRREA preempted the creation of federal common law on this issue and that the rule of decision is therefore to be found either in the federal statute itself or in state law. *Id.* at ——, 114 S.Ct. at 2054.

The Court began its discussion of preemption with the proposition that it "would [not] adopt a court-made rule to supplement federal statutory regulation that is comprehensive and detailed; matters left unaddressed in such a scheme are presumably left subject to the disposition provided by state law." *Id.* The Court then turned to 12 U.S.C. § 1821(d)(2)(A)(i), which, as amended by the

FIRREA, provides that the FDIC "shall ... by operation of law, succeed to all rights, titles, powers, and privileges of the insured depository institution," and explained that this provision "appears to indicate that the FDIC as receiver steps into the shoes of the failed S & L [so that] any defense good against the original party is good against the receiver." *Id.*

The Court went on to hold that the above-quoted provision is an exclusive grant of rights to the FDIC as receiver, which can be neither "supplemented [nor] modified by federal common law." *Id.* Here the Court cited four provisions of the FIRREA—including § 1821(d)(9), which it described parenthetically as "excluding certain state-law claims against FDIC based on oral agreements by the S & L"—that "specifically create special federal rules of decision regarding claims by, and defenses against, the FDIC as receiver.... *Inclusio unius, exclusio alterius.*" *Id.* The Court concluded this aspect of the opinion with the broad observation:

> It is hard to avoid the conclusion that § 1821(d)(2)(A)(i) places the FDIC in the shoes of the insolvent S & L, to work out its claims under state law, except where some provision in the extensive framework of FIRREA provides otherwise. To create additional "federal common-law" exceptions is not to "supplement" this scheme, but to alter it.

*Id.*

■ Although the Court's reasoning appears to leave no room for a federal common law *D'Oench* doctrine, the FDIC here emphasizes that the continuing vitality of *D'Oench* was not directly before the Supreme Court and that the Court did not specifically mention *D'Oench* in its opinion. That is hardly compelling, however, when one considers that "[i]n cases of doubt, the institutional role of the Supreme Court weighs in favor of considering its rulings to be general rather than limited to the particular facts." *Cowin v. Bresler,* 741 F.2d 410, 425 (D.C.Cir. 1984). That point has particular force in this instance, for while the vitality of *D'Oench* was not directly at issue in *O'Melveny & Myers* the Court was specifically advised by both sides on brief and at oral argument that

resolution of the issue before it could also affect the *D'Oench* doctrine. Moreover, although the opinion for the Court does not specifically mention *D'Oench,* it does expressly include one of the *D'Oench*-like statutory provisions (§ 1821(d)(9)) in the list of special federal statutory rules of decision from which it infers that "[*i]nclusio unius, exclusio alterius.*" *O'Melveny & Myers,* — U.S. at ——, 114 S.Ct. at 2054. In so doing the Supreme Court, we think, necessarily decided the *D'Oench* question. To translate: the inclusion of § 1821(d)(9) in the FIRREA implies the exclusion of overlapping federal common law defenses not specifically mentioned in the statute—of which the *D'Oench* doctrine is one.

The FDIC next contends that this interpretation is inconsistent with both the Supreme Court's earlier decision in *Langley v. FDIC,* 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987), and the decisions of several lower courts (including this one) holding that *D'Oench* survives the enactment of the FIRREA. The FDIC suggests that in *Langley* the Court signalled the continuing validity of the *D'Oench* doctrine because it relied upon the *D'Oench* case itself to inform its interpretation of the term "agreement" in § 1823(e). Even if we accepted that interpretation of *Langley,* however, it would surely not dispose of the present issue because the Court decided *Langley* before the Congress enacted the FIRREA. In any event, in *Langley* itself the Court suggested, if anything, that *D'Oench* was even then a dead letter:

> That "agreement" in § 1823(e) covers more than promises to perform acts in the future is confirmed by examination of the leading case in the area prior to the enactment of § 1823(e) in 1950 ... *D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942)....

*Id.* at 92, 108 S.Ct. at 401. Referring to *D'Oench* as the leading case "prior to the enactment of § 1823(e) in 1950" implies that *D'Oench* had lost its vitality as federal common law with the enactment of the FDIA in 1950. At most the Court in *Langley* left that question open.

As for the post-FIRREA decisions of the lower courts, the FDIC is undeniably correct

in its assertion that many courts, including we, have either explicitly stated or implicitly assumed that the federal common law remains alive and well alongside its statutory cousin. *See, e.g. du Pont*, 32 F.3d at 596–97; *NBW*, 826 F.Supp. at 1457–61 (and cases cited therein). Most courts, however, have done so "without even considering the preemption question." *NBW*, 826 F.Supp. at 1458. More specifically, not one court has discussed the impact of last year's decision in *O'Melveny & Myers* upon the continuing vitality of *D'Oench*. As the FDIC notes, our own *du Pont* opinion issued after *O'Melveny & Myers*; but it was briefed and argued before the Supreme Court decision issued, and no party in *du Pont* brought the pendency of the issue in *O'Melveny & Myers* to the attention of the court. We can therefore state with confidence that this court has not heretofore decided what impact *O'Melveny & Myers* has upon the *D'Oench* doctrine.

Finally, as a fallback the FDIC characterizes the *O'Melveny & Myers* opinion as a prohibition only upon "the creation of new federal common law," thus suggesting that the Supreme Court decision does not reach the question whether already extant federal common law was preempted by the enactment of the FIRREA. That interpretation is not literally inconsistent with anything the Supreme Court says in *O'Melveny & Myers:* The federal common law rule at issue in that case appears to have been newly announced by the court of appeals post-FIRREA, and at one point the Court framed the issue before it as whether to "adopt a court-made rule to supplement federal statutory regulation." —— U.S. at ——, 114 S.Ct. at 2054.

■ The problem with such a narrow focus upon *O'Melveny & Myers* is that it excludes from view all that the Supreme Court has said before about the impact of comprehensive new legislation upon existing federal common law. Although federal common law is sometimes a "necessary expedient," *Milwaukee v. Illinois,* 451 U.S. 304, 314–15, 101 S.Ct. 1784, 1791–92, 68 L.Ed.2d 114 (1981), the Court has made clear that

> when Congress addresses a question previously' governed by a decision rested on federal common law the need for such an

unusual exercise of law-making by federal courts disappears.... [The Court's] commitment to the separation of powers is too fundamental to continue to rely on federal common law ... when Congress has addressed the problem.

By stating that "§ 1821(d)(2)(A)(i) places the FDIC in the shoes of the insolvent S & L, to work out its claims under state law, except where some provision in the extensive framework of FIRREA provides otherwise," *O'Melveny & Myers,* —— U.S. at ——, 114 S.Ct. at 2054, the Supreme Court appears to have concluded that the Congress in the FIRREA did indeed address the question previously governed by *D'Oench*. It follows that the need for a body of federal common law under the rubric of *D'Oench* has now "disappeared" and that the district court erred in holding that Murphy's claims are barred under *D'Oench*.

### C. *The procedural claims*

In count 1 of his complaint Murphy seeks a declaratory judgment that the FDIC is required by statute to establish an ADR procedure and to offer Murphy the option of resolving his claim through that procedure; in count 2, he seeks a writ of mandamus compelling that result. The district court granted summary judgment in favor of the FDIC on both counts.

■ The FIRREA does seem to require the FDIC either to establish an ADR process or to explain why such a process is not appropriate for resolving any claims. 12 U.S.C. § 1821(d)(7)(B)(i) ("The [FDIC] shall also establish such alternative dispute resolution processes as may be appropriate for the resolution of claims"). The FDIC appears, however, to have initiated an ADR program since Murphy raised his dispute with the agency. *See Resolution of the Board of Directors of the FDIC Concerning the Implementation of ADR* (Dec. 20, 1994). Therefore, Murphy's request that we order the FDIC to take that step appears to be moot.

■ As for Murphy's request for an order compelling the FDIC to direct his case to an ADR process, we see that the statute gives the agency the discretion to decide whether

to refer any particular case to ADR. 12 U.S.C. § 1821(d)(7)(B)(iii) ("all parties, including ... the [FDIC], must agree to the use of [an ADR] process in a particular case"). Consequently, we decline Murphy's invitation to compel such action.

### III. CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of the FDIC on counts 1 and 2 and reverse the district court's grant of summary judgment on counts 3 through 9. The latter claims are remanded to the district court for further proceedings consistent with this opinion.

*So ordered.*