FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for The Washington Bank, Plaintiff,

v.

ATCHISON & KELLER, et al., Defendants.[1]

Civil Action No. 94–1375 SSH.

United States District Court, District of Columbia.

Jan. 19, 1996.

---

1. Defendant Roland Kinser filed for bankruptcy after this suit was filed, and the case is stayed as to him. The case continues against defendants Atchison & Keller, Jean Kinser, and Williams Industries, Inc.

Tina A. Lamoreaux, FDIC, Closed Bank Litigation, Washington, DC, for Plaintiff.

Mark P. Friedlander, Friedlander & Friedlander, Arlington, VA, for Atchison & Keller, Roland Kinser, Jean Kinser.

Philip Clark Jones, Williams Industries Legal Dept., Merrifield, VA, for Williams Industries.

## OPINION

STANLEY S. HARRIS, District Judge.

Before the Court is the motion of plaintiff Federal Deposit Insurance Corporation ("FDIC") for summary judgment against defendants Atchison & Keller, Jean Kinser, and Williams Industries, Inc., defendants' responses, and plaintiff's reply. Also before the Court is plaintiff's motion to dismiss the counterclaim of defendant Jean Kinser for lack of subject matter jurisdiction, defendant's response, and plaintiff's reply. Upon consideration, plaintiff's motion for summary judgment against defendants Atchison & Keller, Jean Kinser, and Williams Industries is granted. In addition, the Court dismisses defendant Jean Kinser's counterclaim as untimely filed. Plaintiff's motion to dismiss defendant's counterclaim for lack of subject matter jurisdiction is therefore denied as moot.

### Background

On September 11, 1985, Atchison & Keller ("A & K"), through its president, Roland Kinser, executed a Master Promissory Note ("Note") promising to pay to the National Bank of Washington ("NBW") the principal sum of $1,000,000. NBW endorsed the Note over to the Washington Bank ("WB") on April 21, 1987. Under the terms of the Note, A & K promised to pay NBW interest at NBW's floating prime rate plus 1% on the unpaid principal balance monthly until the principal balance was paid. The terms of the Note also provided that the interest and principal were payable on demand.

In the event that A & K was over 10 days late in making a payment to NBW, the Note provided that A & K was to pay a late charge

of 2% per annum in excess of the Note's interest rate, computed on the unpaid principal balance, and the late charge was to relate back to the due date of the payment. A & K also agreed that NBW would be entitled to recover 15% of the unpaid balance of principal and interest additionally as attorney's fees, and costs of suit, should NBW institute suit to collect on the Note.

As security for the Note, Roland Kinser, in his capacity as president of A & K, executed a security agreement giving NBW a security interest in A & K's inventory and accounts receivable. In addition, Roland Kinser executed a pledge/hypothecation agreement assigning a number of shares of stock in favor of NBW, and Roland and Jean Kinser together executed a second pledge/hypothecation agreement, also assigning stock in favor of NBW. The second pledge/hypothecation agreement rendered Roland and Jean Kinser jointly and severally liable for any liabilities incurred under the terms of that agreement.

As additional security for the Note, Roland and Jean Kinser executed, also in their personal capacities, a guaranty (the "Kinser Guaranty"), in which they jointly and severally guaranteed the punctual payment of the principal sum of the Note, any interest thereon, and any court costs and attorney's fees incurred in a suit to collect the unpaid balance of the Note. Finally, Williams Industries, Inc. ("Williams"), through its president and secretary-treasurer, executed a guaranty and a modification thereto (the "Williams Guaranty"), in which Williams likewise guaranteed the punctual payment of the principal sum of the Note, interest thereon, and any costs and fees incurred in a suit to collect the balance of the Note. The Williams Guaranty provided that Williams's liability would never exceed 50% of the amount outstanding, and would not in any circumstances exceed $500,-000, plus interest thereon and any expenses incurred in a suit to collect the amount outstanding.

On April 7, 1989, WB (to whom the Note had been endorsed in 1987 by NBW) made written demand on A & K for payment of all sums due and owing under the Note. A & K did not pay WB those sums. Also on April 7, 1989, WB exercised its right under the Williams Guaranty and demanded that Williams pay $500,000 to WB, pursuant to the terms of the Williams Guaranty. On January 23, 1990, WB and Williams executed an agreement whereby Williams acknowledged its debt to WB and WB agreed to forbear from enforcing the guaranty it held against Williams until February 28, 1990. WB has again made written demand on Williams to pay the sums it owes to WB and Williams has not paid those sums. WB also has made written demand on Jean Kinser to pay all sums due under the terms of the Kinser Guaranty. Jean Kinser has not paid the amount found to be due and owing under the terms of the Kinser Guaranty.

On February 28, 1990, Roland and Jean Kinser paid to WB a check in the amount of $314,950.39, in satisfaction of a detinue judgment issued against the stock pledged in the Kinser pledge/hypothecation agreements. The Kinsers had directed in a letter accompanying the check that the check be applied to principal and interest on the Note. WB applied the check to legal fees and bond costs WB had incurred in pursuing the detinue judgment, applying the remainder to outstanding interest and principal.

On March 5, 1990, WB liquidated the stock held pursuant to the Kinsers' pledge-hypothecation agreements, netting the sum of $294,-070.16. WB applied the sum to defray further attorney's fees expended in connection with its pursuit of payment on the Note, accrued interest, and another portion of the outstanding principal of the Note.

*Analysis*

*Plaintiff's Motion for Summary Judgment*

■■■ Summary judgment may be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In considering a summary judgment motion, all evidence and the inferences to be drawn from it must be considered in a light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586,

106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Summary judgment cannot be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Here, plaintiff has shown that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. Although "[f]indings of fact and conclusions of law are unnecessary on decisions of motions under Rule 12 or 56," the Court nonetheless briefly sets forth its analysis. *See* Fed.R.Civ.P. 52(a); *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2511.

First, Williams has filed a response indicating that it "does not oppose" the motion for summary judgment filed by the FDIC. Second, the opposition filed by defendants Jean Kinser and A & K raises no arguments on behalf of A & K. Plaintiff's motion for summary judgment against A & K may therefore be treated as conceded, pursuant to Local Rule 108(b). In defendants' opposition, Jean Kinser contends only that WB misapplied sums previously paid by the Kinsers to WB, and that the FDIC must pursue its claims against Williams under the Williams Guaranty before pursuing its claims against Jean Kinser under the Kinser Guaranty.

Jean Kinser first argues that Roland Kinser submitted a payment of $314,950.39 to WB on February 28, 1990, in satisfaction of a detinue judgment obtained by WB against the stock held by the Kinsers and pledged in the two Kinser pledge/hypothecation agreements. Jean Kinser argues that Roland Kinser directed that the check be applied solely to interest and principal due on the Note, and that WB "misapplied" the payment by first satisfying bond costs and attorney's fees accrued in pursuing payment on the Note and then applying the balance of the check to interest and then to principal. Jean Kinser apparently contends that if WB had applied the February 28, 1990, payment "properly," the Kinsers would actually be owed money by the FDIC. (This is the basis of Jean Kinser's counterclaim, which is treated *infra.*) Kinser's argument is without merit. The terms of the pledge agreement provide that WB (and the FDIC) has "sole discretion" to apply payments received "on account of" a security obligation, and no other agreement has been alleged to exist whereby the Kinsers had the right to direct that payments be applied in a particular fashion to outstanding debt, interest, costs, and fees owed. Any oral agreement to this effect would be barred as a defense under 12 U.S.C. § 1823(e). That section provides:

> No agreement which tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the [FDIC] unless such agreement—
>
> (A) is in writing;
>
> (B) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
>
> (C) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
>
> (D) has been, continuously, from the time of its execution, an official record of the depository institution.

Section 1823(e)(1) is "applicable only to cases involving a specific asset, usually a loan, which in the ordinary course of business would be recorded and approved by the bank's loan committee or board of directors." *E.I. du Pont de Nemours & Co. v. FDIC,* 32 F.3d 592, 597 (D.C.Cir.1994). The "specific asset" in this case, of course, is the Master Promissory Note and the ancillary guarantees and pledges arising therefrom. Any claims Jean Kinser could raise with regard to the Note and any alleged unrecorded agreements relating to the Note or to the guarantees are therefore barred by 12 U.S.C.

§ 1823(e).[2]

■ Jean Kinser next claims that the FDIC is required to pursue its claims against Williams under the Williams Guaranty prior to seeking payment from her under the Kinser Guaranty. The terms of the Kinser Guaranty belie this contention. Jean Kinser is obligated to pay "any and all liabilities" of A & K arising from the Note, and the Kinser Guaranty makes no provision for WB to seek payment from a co-guarantor prior to seeking payment from either or both of the Kinsers. Nor is there any evidence to support Jean Kinser's speculation that there are bank memoranda evidencing a side agreement between Williams and WB that WB would look to Williams for payment under its Guaranty before turning to the Kinsers under their Guaranty. Summary judgment against defendant Jean Kinser cannot be avoided by a single speculative statement unsupported by any document in the record of this case.

■ Jean Kinser also argues in her opposition that Williams's liability was "fixed" at $500,000, pursuant to the extension agreement executed by Williams in January 1990. This contention is equally unsupportable. Williams's obligation on the Note decreases with any payment made on the principal balance of the Note, pursuant to the terms of the Williams Guaranty, but in no event would Williams be obligated to pay more than $500,000 of outstanding principal and interest. The liquidation of the Kinsers' stock held by WB pursuant to the pledge-hypothecation agreements reduced the principal balance on the Note, which likewise reduced Williams's obligation under its Guaranty. Jean Kinser's contention that the Extension Agreement somehow "fixed" Williams's liability at $500,000, is untenable.

### Jean Kinser's Counterclaim Against FDIC

In her answer to the complaint, Jean Kinser (and Roland Kinser, now in bankruptcy) asserted a counterclaim against the FDIC. *See* Answer, Crossclaim and Counterclaim of Defendants Atchison & Keller, Inc., Roland E. Kinser and Jean Kinser, ¶¶ 34–35. The Kinsers stated that their Guaranty "has been fully satisfied and, in fact, has been overpaid...." *Id.* at ¶ 34. The Kinsers base their counterclaim against the FDIC on their payment, on February 28, 1990, of $316,950.39, to WB, in satisfaction of a detinue judgment obtained against the stock the Kinsers had pledged in the pledge/hypothecation agreements they executed as security for the Note. *Id.* at ¶ 35. The Kinsers claim that Roland Kinser specifically directed that the $316,950.39 be applied in a particular fashion to satisfy obligations under the note—namely, that the money be applied to interest and principal—and that the FDIC "misapplied" the payment by applying the sum first to satisfy costs and attorney's fees, and second toward interest and principal.[3]

■ Plaintiff filed a motion to dismiss the Kinsers' counterclaim for lack of subject matter jurisdiction prior to the filing of plaintiff's motion for summary judgment, contending that since the Kinsers had not pursued their

---

**2.** The decision of the District of Columbia Circuit in *Murphy v. FDIC*, 61 F.3d 34 (D.C.Cir.1995), does not alter this analysis. The Court of Appeals in *Murphy* held that, following the opinion of the Supreme Court in *O'Melveny & Myers v. FDIC*, —— U.S. ——, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994), the federal common law *D'Oench, Duhme* doctrine had been supplanted by Congress when it enacted the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), Pub.L. No. 101–73, 103 Stat. 183. 61 F.3d at 39. In addition, the Court of Appeals held that for the FDIC to successfully assert a defense grounded in 12 U.S.C. § 1823(e), the FDIC must demonstrate that its interest in a "specific asset"—*i.e.*, a loan—would be diminished if a claimant alleging an unrecorded agreement against the FDIC were to succeed. 61 F.3d at 37–38. Here, the FDIC can demonstrate and

has demonstrated that, were Jean Kinser successfully to assert any claims against the FDIC based on alleged unrecorded side agreements between a co-guarantor and the failed bank of which the FDIC now is a receiver, the FDIC's interest in a specific asset (the Master Promissory Note and the pledges and security agreements underlying it) would be substantially diminished.

**3.** The Kinsers refer to their "counterclaim" as a "setoff" in their answer. The two terms are interchangeable in this context. *See FDIC v. Modular Homes, Inc.*, 859 F.Supp. 117, 119–20 (D.N.J.1994) (defendant in action by FDIC as receiver could not raise "set-off" as defense without first resorting to statutory administrative claims process).

claim against the FDIC through the mandatory administrative claims process outlined in 12 U.S.C. § 1821(d), the Court lacks subject matter jurisdiction over the Kinsers' counterclaim. While plaintiff's motion to dismiss defendants' counterclaim was pending, the Kinsers submitted their claims to the FDIC–Receiver pursuant to 12 U.S.C. § 1821(d), along with a request to file their claims well past the "bar date" established by the FDIC for receipt of claims. The FDIC–Receiver rejected the Kinsers' request to late-file their claims and disallowed the Kinsers' claims as untimely filed. A disallowance for failure to timely file a claim is "final"; the Court has no authority to conduct a *de novo* review of a claim disallowed as untimely by the FDIC. *See* 12 U.S.C. § 1821(d)(5)(C)(i). *See also Althouse v. RTC,* 969 F.2d 1544, 1546 (3rd Cir.1992) (noting that an untimely administrative claimant cannot circumvent the administrative process outlined in § 1821(d) by obtaining *de novo* judicial review of his untimely claim).

 One exception exists to the rule presented in 12 U.S.C. § 1821(d)(5)(C)(i). Section 1821(d)(5)(C)(ii) provides that if a claimant establishes that she did not receive notice of the appointment of the receiver in time to file her claim before the bar date, a receiver may consider her late-filed claim. *Althouse,* 969 F.2d at 1546; *Palumbo v. Roberti,* 839 F.Supp. 80, 84–85 (D.Mass.1993). The Kinsers have never alleged that they were not aware of the appointment of a receiver; they alleged in their filing of claim with the FDIC only that they had no notice of a time bar to their filing a claim with WB. Decl. of Pam Ippolito (Ex. 5 to Pl.'s Mot. for Summ. J.), Ex. C. This contention does not suffice:

> By its terms ... the exception [in § 1821(d)(5)(C)(ii) ] only applies to claimants who do not receive notice of the fact of the appointment of a receiver. The exception makes no reference to claimants who are aware of the appointment of a receiver but who do not receive notice of the filing deadline. Therefore, a claimant's assertion that he or she was not made aware of the filing deadline, as distinct from an assertion that the claimant was not aware of the fact of receivership, does

not bring the claimant within the exception.

 *McLaughlin v. FDIC,* 796 F.Supp. 47, 49 (D.Mass.1992). Since Jean Kinser has not established that she is entitled to have her late-filed claim considered by the Court pursuant to the exception noted in 12 U.S.C. § 1821(d)(5)(C)(ii), the Court may not consider her counterclaim anew.

In conclusion, since Williams has stated that it does not oppose the FDIC's motion for summary judgment, and since A & K advanced no arguments in opposition to the motion, summary judgment will be granted against those defendants. In addition, since no material issue of fact remains to be determined and since Jean Kinser's contentions in her opposition are without merit, summary judgment will be granted against Jean Kinser as well. Finally, because Jean Kinser's counterclaim against the FDIC was not timely filed with the FDIC pursuant to 12 U.S.C. § 1821(d)(5)(C), Jean Kinser's counterclaim is dismissed.