**CALASKA PARTNERS LTD.**

v.

**Inger E. CORSON, et al.**

Supreme Judicial Court of Maine.

Argued Dec. 4, 1995.

Decided March 7, 1996.

Randall B. Weill (orally) Preti, Flaherty, Beliveau & Pachios, Portland, for Plaintiffs.

U. Charles Remmel (orally) and Leland N. Chisholm, Kelly, Remmel & Zimmerman, Portland, for defendants.

Before ROBERTS, GLASSMAN, CLIFFORD, RUDMAN, DANA and LIPEZ, JJ.

CLIFFORD, Justice.

Inger Corson appeals and Calaska Partners cross-appeals from the judgment entered in the Superior Court (Cumberland County, *Brodrick, J.*) following a nonjury trial in which the court determined that Maine Savings Bank, one of Calaska's predecessors in interest on a loan, had violated the Equal Credit Opportunity Act (ECOA), 15 U.S.C.A. §§ 1691–1691f (1982 & Supp.1994),[1]

---

1. 15 U.S.C.A. 1691 (1982 & Supp.1994) provides in pertinent part:

    (a) It shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction—

    (1) on the basis of race, color, religion, national origin, sex or marital status. . . .
Pursuant to section 1691b of the ECOA, the Board of Governors of the Federal Reserve System are given the authority to "prescribe regulations to carry out the purposes of this sub-

by requiring Inger to cosign on a note to evidence a line of credit and a mortgage as security for a line of credit that was solely for the benefit of her husband, David, who was at that time individually creditworthy. In acknowledgement of the violation, although the court ordered a foreclosure of the mortgage and a sale of the family residence owned jointly by Inger and David, it ordered that Inger receive fifty percent of the net proceeds of the sale. We agree with Inger that the court erred in ordering a foreclosure of the mortgage and a sale of the entire residence when only David was a judgment-debtor. Accordingly, we vacate the judgment.

Inger and David Corson are a married couple living in the town of Yarmouth. David is a practicing attorney and Inger is a homemaker. The Corsons hold title to their family residence located in Yarmouth as joint tenants. In 1984, due to financial peaks and valleys associated with his law practice, David applied to Maine Savings Bank (MSB) for a $200,000 line of credit to stabilize the cash flow of his law practice and to finance long-term improvements to his law office; Inger was not to receive any of the proceeds of the loan.

To obtain the loan, David submitted to MSB a personal financial statement listing the value of David's real estate, stock, and insurance holdings.[2] Although David's individual share of the net real estate exceeded $600,000, MSB conditioned its extension of credit on obtaining both David and Inger's signatures on a note and mortgage encumbering the family residence.

Richard Rummler, the MSB loan officer responsible for David's application, testified that his decision to extend the $200,000 line of credit to David was based solely on the valuation placed on the Corson family residence. The decision to focus solely on the residence as collateral for the credit line was based in part on purported weaknesses in David's other assets and, in part, on the fact that it was a longstanding practice in the industry "to obtain the signature of both spouses on the loan document" when only one spouse applied for a loan.

In 1985, at David's request, MSB increased his credit line to $250,000. In 1988, David obtained an additional $200,000 from Key Bank, secured by a second mortgage on the Corson family residence. When David's credit line with MSB matured in September of 1988, the loan became delinquent and MSB suggested that David refinance the debt with a conventional mortgage with a different lender. After David's unsuccessful attempt to refinance the debt with another lender, MSB agreed to restructure the debt with repayment terms similar to a thirty-year mortgage loan with the balance due at the end of two years. Collateral for the restructured MSB loan was the 1984 mortgage on the family residence. The loan became due in January 1991, with an outstanding balance of $247,084.

On February 1, 1991, the Federal Deposit Insurance Corporation (FDIC) was appointed receiver of MSB. On that same date, Fleet Bank entered into a purchase and assumption agreement with the FDIC to take over certain of MSB's assets, including the Corson loan. Thereafter, on March 29, 1991,

---

chapter." The Board thereafter promulgated Regulation B, that provides in pertinent part:
  (d) Signature of spouse or other person.
    (1) Rule for qualified applicant. Except as provided in this paragraph, a creditor shall not require the signature of an applicant's spouse or other person, other than a joint applicant, on any credit instrument if the applicant qualifies under the creditor's standards of creditworthiness for the amount and terms of the credit requested.
    . . . .
    (5) Additional parties. If, under a creditor's standards of creditworthiness, the personal liability of an additional party is necessary to support the extension of the credit requested, a creditor may request a cosigner, guarantor, or the like. The applicant's spouse may serve as an additional party, but the creditor shall not require that the spouse be an additional party.
12 C.F.R. § 202.7.

2. The statement listed, *inter alia,* four separate properties: two that David held jointly with Inger valued at $630,000, and two that David held jointly with another relative, valued at $1,400,000.

Fleet instituted foreclosure proceedings against the Corsons.[3] In their answer, David and Inger alleged that MSB had violated the ECOA by requiring Inger's signature on the note and mortgage. Following a hearing, the court (*Perkins, J.*) denied Fleet's motion for a summary judgment, finding that a triable issue remained as to whether MSB had violated the ECOA. Fleet thereafter sold the Corson loan to Calaska and, on March 17, 1994, Calaska was substituted as party plaintiff in place of Fleet.

Following a nonjury trial, the court (*Brodrick, J.*) determined that David was individually creditworthy at the time he first applied for a line of credit with MSB and that MSB had violated "the spirit and the letter" of the ECOA by requiring Inger's guaranty despite David's personal financial wherewithal. The court entered judgment in favor of Calaska against David personally in the amount of $247,084; in favor of Inger on the note; and a foreclosure against the property owned jointly by David and Inger, but with Inger to receive fifty percent of the net proceeds of the sale. Inger appeals and Calaska cross-appeals from the judgment.

3. Fleet included in its complaint Key Bank and Maine National Bank as parties-in-interest because each held a junior mortgage on the Corson family residence.

4. 12 U.S.C.A. § 1821(d)(13)(D) provides in pertinent part:

   **(D) Limitation on judicial review**
   Except as otherwise provided in this subsection, no court shall have jurisdiction over—
   (i) any claim or action for payment form, or any action seeking a determination of rights with respect to, the assets of any depository institution for which the Corporation has been appointed receiver, including assets which the Corporation may acquire from itself as such receiver; or
   (ii) any claim relating to any act or omission of such institution or the Corporation as receiver.

5. Calaska also contends that Inger's ECOA "defense" is really not a defense at all, but rather a counterclaim and therefore clearly within FIRREA's administrative exhaustion requirement. Although courts in other jurisdictions have held that the ECOA cannot be asserted as an affirmative defense, *CMF Virginia Land, L.P. v. Brinson*, 806 F.Supp. 90, 95 (E.D.Va.1992); *United States v. Joseph Hirsch Sportswear Co., Inc.*, 1989 WL 20604 (E.D.N.Y.), *aff'd*, 923 F.2d 842 (2d Cir.

**I.**

▅▅ As an initial matter, Calaska contends that pursuant to section 1821(d)(13)(D)[4] of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), the court was without jurisdiction to entertain Inger's ECOA affirmative defense. We disagree.

FIRREA contains an Administrative Claims Review Process (ACRP), 12 U.S.C.A. §§ 1821(d)(3)–(10), designed to facilitate resolution of claims against receivers. FIRREA requires exhaustion of the administrative remedies provided within the ACRP before any court may obtain subject matter jurisdiction over a claim or action against the assets of a failed financial institution. *Simon v. F.D.I.C.*, 48 F.3d 53, 56 (1st Cir.1995). The issue before us, however, is whether affirmative defenses are likewise subject to this exhaustion requirement.[5] Although the federal courts that have examined this issue have not all come to the same conclusion,[6] the best reasoned of the cases have concluded that affirmative defenses are not subject to FIRREA's administrative exhaustion requirement and may be asserted for the first time in a non-

1990), we have already determined that a defendant may assert a violation of the ECOA as an affirmative defense if it is in the nature of recoupment. *F.D.I.C. v. Notis*, 602 A.2d 1164, 1166 (Me.1992).

6. Three distinct interpretations of section 1821(d)(13)(D) have emerged from the case law: (1) all affirmative defenses are subject to the exhaustion requirement, *see e.g. F.D.I.C. v. Barnaby*, 839 F.Supp. 935, 939 (D.Me.1993); *Federal Sav. & Loan Ins. Corp. v. Shelton*, 789 F.Supp. 1367, 1371 (M.D.La.1992); *Resolution Trust Corp. v. Tri–State Realty Investors of K.C., Inc.*, 838 F.Supp. 1448, 1451 (D.Kan.1993); (2) only those affirmative defenses that could have been the basis for an independent claim against the receiver or failed institution are subject to the exhaustion requirement, *see, e.g., Resolution Trust Corp. v. Midwest Fed. Sav. Bank of Minot*, 36 F.3d 785, 793 (9th Cir.1993); *Resolution Trust Corp. v. Schonacher*, 844 F.Supp. 689, 694 (D.Kan.1994); and (3) only claims and counterclaims, not affirmative defenses, are subject to the exhaustion requirement. *See, e.g., National Union Fire Ins. Co. of Pittsburgh, Pa. v. City Sav., F.S.B.*, 28 F.3d 376, 393 (3rd Cir.1994); *F.D.I.C. v. Philadelphia Auth. for Indus. Dev.*, 1995 WL 602898 (E.D.Pa.1995); *F.D.I.C. v. Modular Homes, Inc.*, 859 F.Supp. 117, 123 (D.N.J.1994).

ACRP proceeding. Accordingly, the court had jurisdiction to considers Inger's ECOA defense.

## II.

■ Calaska next contends that the FDIC was a holder in due course (HDC) and therefore took the Corson note free from Inger's personal ECOA defense. As a subsequent purchaser of the note, Calaska contends it acquired that same status. The first question is whether federal or state HDC requirements govern the determination of Calaska's status.

The First Circuit Court of Appeals has reiterated and applied the federal holder in due course doctrine in situations where the FDIC becomes the receiver of a failed financial institution:

> [A]s a matter of *federal common law,* the FDIC has a complete defense to state and common law fraud claims on a note acquired by the FDIC in the execution of a purchase and assumption transaction, for value, in good faith, and without actual knowledge of the fraud at the time the FDIC entered into the purchase and assumption agreement.

*In re 604 Columbus Ave. Realty Trust,* 968 F.2d 1332, 1350 (1st Cir.1992) (emphasis added) (citation omitted). A recent United States Supreme Court decision, however, has called into question whether the federal holder in due course doctrine remains viable.

In *O'Melveny & Myers v. F.D.I.C.,* —— U.S. ——, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994), the United States Supreme Court held that FIRREA requires the receiver to "step[ ] into the shoes of the failed [institu-

tion] ... [and] [t]hereafter ... any defense good against the original party is good against the receiver." *O'Melveny & Myers,* —— U.S. at ——, 114 S.Ct. at 2054 (internal quotations and citations omitted). The receiver must therefore "work out its claims under state law, except where some provision in the extensive framework of FIRREA provides otherwise. To create additional 'federal common-law' exceptions is not to 'supplement' this scheme, but to alter it." *Id.* Courts that have examined this issue in the "post-*O'Melveny* era" have determined that HDC status is a question of state law. *Di- Vall Insured Income Fund Ltd Partnership v. Boatmen's First Nat'l Bank of Kansas City,* 69 F.3d 1398, 1402–03 (8th Cir.1995) ("Accordingly, we hold that *O'Melveny* removes the federal common law *D'Oench Duhme* doctrine and the federal holder in due course doctrine. . . . [T]he holder in due course issue must be decided under state law."); *Resolution Trust Corp. v. Maplewood Investments,* 31 F.3d 1276, 1293–94 (4th Cir. 1994) (question of whether RTC is an HDC is governed by state law); *Resolution Trust Corp. v. A.W. Assoc., Inc.,* 869 F.Supp. 1503, 1510 (D.Kan.1994) (citing *O'Melveny* for the proposition that the court "must apply [state] law to determine whether RTC is a holder in due course."). We agree with this interpretation of the *O'Melveny* decision and we therefore must look to Maine law to determine whether Calaska is entitled to HDC status.

■ Under Maine law, the holder of an instrument achieves HDC status if the holder complies with the requirements of 11 M.R.S.A. § 3–1302 (1995).[7] The court in

---

**7.** 11 M.R.S.A. § 3–1302 (1995) provides in pertinent part:

(1) Subject to subsection (3) and section 3–1106, subsection (3), "holder in due course" means the holder of an instrument if:
  (a) The instrument when issued or negotiated to the holder does not bear such apparent evidence of forgery or alteration or is not otherwise so irregular or incomplete as to call into question its authenticity; and
  (b) The holder took the instrument:
    (i) For value;
    (ii) In good faith;
    (iii) Without notice that the instrument is overdue or has been dishonored or that there

is an uncured default with respect to payment of another instrument issued as part of the same series;
    (iv) Without notice that the instrument contains an unauthorized signature or has been altered;
    (v) Without notice of any claim to the instrument described in section 3–1306; and
    (vi) Without notice that any party has a defense or claim in recoupment described in section 3–1305, subsection (1).
. . . .
(3) Except to the extent a transferor or predecessor in interest has rights as a holder in due course, a person does not acquire rights of a holder in due course of an instrument taken:

*A.W. Assoc.* determined, pursuant to an identical version of section 302,[8] that HDC status is not conferred "when the financial instruments are transferred in bulk to the RTC." *Id.* at 1510. "Courts have concluded that [section 302] applies to the transfer of instruments to the FDIC (or RTC) pursuant to a purchase and assumption agreement and have determined that such a transaction is not 'in the ordinary course' of the savings and loan's business." *Id.* at 1509 (citations omitted). Because the FDIC in the instant case did not achieve HDC status under Maine law by virtue of its purchase and assumption of MSB, Calaska did not acquire such status merely because it was one of the FDIC's successors in interest. Moreover, at the time it acquired the Corson note from Fleet, Calaska was well aware of Inger's potential defense to enforcement of the note. Accordingly, Calaska was not a holder in due course and its status does not operate to bar Inger from asserting her personal ECOA defense.

### III.

■■■ Calaska next contends that the court erred in concluding that David was individually creditworthy in 1984 and that therefore MSB had violated the ECOA by requiring Inger's signature. We will reverse a trial court's factual determination only if

"(1) there is no competent evidence in the record to support it, or (2) it is based upon a clear misapprehension by the trial court of the meaning of the evidence, or (3) the force and effect of the evidence, taken as a total entity, rationally persuades to a certainty that the finding is so against the great preponderance of the believable evidence that it does not represent the truth and right of the case."

. . . .

   (b) By purchaser as part of a bulk transaction not in ordinary course of business of the transferor. . . .

8. The statute at issue in *A.W. Assoc.* provides in pertinent part:
   (c) Except to the extent a transferor or a predecessor in interest has rights as a holder in

*Pongonis v. Pongonis,* 606 A.2d 1055, 1057–58 (Me.1992) (quoting *Harmon v. Emerson,* 425 A.2d 978, 982 (Me.1981)).

The trial court found as fact that David's share of the net real estate assets exceeded $600,000 at the time he first applied to MSB for a $200,000 line of credit. Claska contends that although the value of those assets was substantial and normally would be sufficient to establish a $200,000 line of credit, the assets were of insufficient quality because other parties also had ownership interest in them. Rummler admitted on cross-examination, however, that "it was long-standing practice in the lending ... industry, when one spouse would apply for a loan[,] to obtain the signature of both spouses on the loan document ... [and] that was the practice [Rummler] followed with [David's] loan." Although there was evidence that would support a finding that David was not individually creditworthy, we will not substitute our judgment for that of the trial court. *Estate of Record,* 534 A.2d 1319, 1323 (Me.1987) (citing *Harmon,* 425 A.2d at 982).

### IV.

■■■ Inger contends that because the trial court determined that her signature on the note was obtained in violation of the ECOA, the court erred by entering a judgment that would permit Calaska to foreclose on the entire property. We agree. The court had the authority, pursuant to the ECOA, to "grant such equitable and declaratory relief as [was] necessary to enforce the requirements imposed under this subchapter." 15 U.S.C.A. § 1691e(c). Although the court attempted to use its equitable powers to "protect" Inger's financial interest in the family residence by ordering that she receive fifty percent of the proceeds, the court was without discretion to order such foreclosure when

due course, a person does not acquire rights of a holder in due course of an instrument taken
   . . . .
   (2) by purchase as part of a bulk transaction not in ordinary course of business of the transferor.
K.S.A. § 84–3–302(c)(2) (Supp.1993).

only David remained obligated on the mortgage. *Szelenyi v. Miller,* 564 A.2d 768, 770 (Me.1989) (when malpractice award is made against husband alone, wife's "joint tenancy interest in real ... property cannot be reached by the judgment creditor."); *Schaefer v. Peoples Heritage Sav. Bank,* 669 A.2d 185, 187 (Me.1996) ("When [a] mortgage is foreclosed, the joint tenancy is severed and the mortgagee becomes a tenant in common.") Accordingly, Calaska may foreclose only on David's one-half interest in the family residence.[9]

The entry is:

Judgment vacated. Remanded to the Superior Court for further proceedings consistent with the opinion herein.

All concurring.

---

9. Because Calaska may foreclose only on David's one-half interest in the family residence, we need not address Inger's second contention that she

was entitled to fifty percent of the proceeds prior to the deduction of the sale expenses.