**FEDERAL DEPOSIT INSURANCE COR-PORATION, As Receiver For New Maine National Bank, Plaintiff, Appellant,**

v.

**Roland HOUDE and Ora Houde, Defendants, Appellees.**

**FEDERAL DEPOSIT INSURANCE COR-PORATION, As Receiver For New Maine National Bank, Plaintiff, Appellee,**

v.

**Roland HOUDE and Ora Houde, Defendants, Appellants.**

Nos. 95–1853, 95–1854.

United States Court of Appeals, First Circuit.

Heard March 8, 1996.

Decided July 24, 1996.

Jaclyn C. Taner, Counsel, Washington, DC, with whom Ann S. DuRoss, Assistant General Counsel, Colleen B. Bombardier, Senior Counsel, Federal Deposit Insurance Corporation; Andrew Sparks, Paul E. Peck, John B. Emory and Drummond & Drummond, Portland, ME, were on briefs for plaintiff.

Jeffrey Bennett, Portland, ME, with whom Melinda J. Caterine, Clare S. Benedict and Bennett and Associates, P.A. were on briefs for defendants.

Before BOUDIN, Circuit Judge, CAMPBELL, Senior Circuit Judge, and LYNCH, Circuit Judge.

LEVIN H. CAMPBELL, Senior Circuit Judge.

The Federal Deposit Insurance Corporation ("FDIC") appeals from an order, entered in the United States District Court for the District of Maine, dismissing its complaint to collect the amount due on a $275,000 promissory note executed in 1986 by defendants Roland and Ora Houde and made payable to the Maine National Bank, and to foreclose on the mortgage securing the Houdes' indebtedness. The Houdes cross-appeal from the district court's denial of four pretrial motions. For the reasons set forth below, we affirm the district court's order.

## I.

In November 1986, Roland and Ora Houde borrowed $275,000 from the Maine National Bank ("MNB"), a federally insured national banking association, to finance a business venture. They executed a note and allonge made payable to MNB (collectively the "Note" or "Houde Note"), and secured by a mortgage on property located in Maine. After MNB declared insolvency in January 1991, ownership of the Note passed to the FDIC as receiver, the FDIC says. The FDIC also says that it transferred the Houde Note briefly to the New Maine National Bank ("NMNB"), a bridge bank set up by the FDIC. After the dissolution of NMNB in July 1991, many of its assets were purchased by Fleet Bank and the rest, as recounted by the FDIC, passed to the FDIC as the duly appointed receiver for NMNB. The FDIC asserts that the Note was among the remaining assets transferred to it. All parties agree, in any case, that the original Note was in the possession of the FDIC at trial.

The FDIC says that it hired Recoll Management Corporation ("Recoll") to manage the receivership assets of NMNB. The FDIC maintains that Recoll took over management of the Note as well as other obligations owed by the Houdes. These other obligations included loans from MNB to Turcotte Concrete, a corporation of which Mr. Houde was a 50% shareholder, that were guaranteed by the Houdes. Turcotte Concrete filed for bankruptcy in 1991, and as part of the bankruptcy proceeding, Recoll, on behalf of the FDIC, negotiated an agreement in June 1993 resolving Turcotte Concrete's debt (the "Conditional Amendment to Guaranty Agreements and Promissory Notes," or "Conditional Agreement"). According to the FDIC, Recoll separately negotiated with the Houdes concerning their personal debt evidenced by the Note. The Houdes, however, contend that the Conditional Agreement resolving Turcotte Concrete's obligations, by its own terms, released their personal obligations on the Note. On this theory, they have made no payments on the Note since June 1993.

In July 1994, the FDIC sued the Houdes in Maine state court to collect the amount due on the Note and to foreclose on the mortgage securing the debt. The Houdes removed the action to the United States District Court for the District of Maine and then moved to dismiss or for summary judgment on the ground that their personal indebtedness on the Note had been discharged by the Conditional Agreement. The district court denied the motions in September 1994, concluding that there were genuine issues of fact as to the meaning and intent of the Conditional Agreement. In early 1995, the Houdes moved for judgment on the pleadings as well as for summary judgment, reiterating their claim that the Conditional Agreement

unambiguously released them from the Note. In the Houdes' Statement of Undisputed Material Facts submitted in connection with their summary judgment motion, the Houdes acknowledged that the FDIC had been appointed as receiver for MNB. The Houdes also moved to dismiss, or for a default judgment based on a claim that the servicing agreement between the FDIC and Recoll violated the Maine champerty statute. *See* 17–A M.R.S.A. § 516(1). The FDIC cross-moved for summary judgment. In May 1995, the district court denied these motions.

A jury trial was scheduled for early June 1995. Shortly before trial, the FDIC filed a motion in limine seeking to preclude the Houdes from questioning the FDIC's standing to recover on the Note. The Houdes opposed this motion. The district court denied the motion without addressing the merits of the standing issue. At trial, the parties stipulated that (1) the FDIC possessed the original Note, (2) the Houdes' signatures on the documents were authentic, and (3) the Houdes had made no payments on the Note since June 1993. The FDIC offered in evidence the original Note which was payable to MNB and had not been indorsed to any other entity. The FDIC called as a witness James Golden, the FDIC account officer, who had only been the custodian of the Houde file for the two weeks prior to trial. Golden testified to the series of events occurring after the failure of MNB up until the time of trial: (1) the FDIC was appointed receiver of MNB, (2) the Note passed to NMNB, a bridge bank set up by the FDIC, (3) the FDIC dissolved NMNB, (4) the Note passed to the FDIC as receiver for NMNB. Golden testified that the Note was *not* among the NMNB assets that Fleet Bank purchased from the FDIC. The FDIC did not offer or have with it any public or business records evidencing the transfers to which Golden testified.

The Houdes objected to Golden's testimony and to the introduction of the Note in evidence, arguing that Golden's testimony was inadmissible hearsay, as he had no personal knowledge of the transactions to which he testified. In addition, they argued that Golden's testimony was not the best evidence of the transactions in question. The district court sustained the Houdes' objection and struck Golden's testimony. The FDIC then requested a short continuance to allow it to obtain documentation of the underlying transactions to which Golden had testified. The court denied a continuance, granting judgment as a matter of law in favor of the Houdes. The court stated that there was "no basis whatsoever on which a jury could conclude that the plaintiff is entitled to enforce this note."[1] In response to the FDIC counsel's indication that he would file a motion for reconsideration of the directed verdict later that afternoon, the court indicated that it would not reconsider its decision. The court issued a final judgment dismissing the FDIC's action on June 8, 1995.

## II.

The FDIC contends that the district court erred in finding that the evidence of the FDIC's ownership of the Note was so inadequate that the FDIC's claim to enforce the Note against its makers, the Houdes, fails as a matter of law. Alternatively, the FDIC argues that the district court abused its discretion in refusing to grant a brief continuance so as to enable the FDIC to procure records that would establish its requisite in-

1. The district court ruled from the bench:
   There is a complete gap in the evidence between the time the bank [sic] was lawfully in the possession of Maine National Bank and the title to the document was in Maine National Bank, and the time that it ultimately came to rest in the possession of this plaintiff, and there is no formal proof, first of all that Maine National Bank ever went into receivership, if so, what happened with respect to any of the assets of that institution as a result of that, specifically what happened with respect to this note and mortgage. And there is no proof or evi-

dence sufficient to permit a jury to reach a verdict in favor of the plaintiff with respect to what happened to that note, and what has been referred to as its many transitions in ownership among, apparently New Maine National Bank, Fleet Management Corporation, Fleet Bank and RECOLL Management Corporation, and ultimately its transfer back into the possession of FDIC. It is not even clear that the note ever left the possession of the FDIC in the first place, but all of that is completely in doubt.

terest in the Note. The Houdes reply that the FDIC never presented competent proof of the various transactions through which it allegedly acquired lawful ownership and possession of the Note, Golden's testimony having, in their view, been rightly stricken as hearsay. They argue that without such competent evidence, the FDIC's case failed as a matter of law.

The district court dismissed the case because it concluded that the FDIC had failed to meet its burden of presenting sufficient evidence to establish, prima facie, that it was a party entitled to enforce the Note. Without proper proof of ownership, the Note would not be admissible as a basis for the FDIC's claim. The question, of course, would not be whether the FDIC's right to enforce the Note was conclusively established but whether enough of a case was made out to go to the jury. *See* Fed.R.Civ.P. 50(a) ("If ... there is no legally sufficient evidentiary basis for a reasonable jury to find for [a] party on [an] issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party.").

### 1. The FDIC's Burden of Proof

■ The FDIC argues that possession of the Note was a sufficient basis for it to be entitled to a presumption that it could enforce the Note. The FDIC points to federal law, set forth in FIRREA,[2] providing expressly that the FDIC succeeds by operation of law to a failed bank's right and title in all its assets, *see* 12 U.S.C. § 1821(d)(2)(A), *infra*. FIRREA, however, does not spell out what the FDIC needs to prove in order to show its entitlement to sue on a transferred asset like the Note. The Supreme Court has recently held that matters left unaddressed in FIRREA are controlled by state law. *O'Melveny & Myers v. FDIC,* —— U.S. ——, ——, 114 S.Ct. 2048, 2054, 129 L.Ed.2d 67 (1994). We look, therefore, to Maine law to supplement FIRREA in determining what the FDIC, as receiver of NMNB, needed to show for it to be found a party entitled to enforce the Note. *See, e.g., RTC v. Maplewood Invs.,* 31 F.3d 1276, 1293–94 (4th Cir. 1994) (holding that question of whether RTC is a holder in due course is governed by state law); *see also FDIC v. Grupo Girod Corp.,* 869 F.2d 15, 17 (1st Cir.1989) (applying Puerto Rico law to determine whether the FDIC was a holder in due course); *FDIC v. Bandon Assocs.,* 780 F.Supp. 60, 63 (D.Me.1991). *But see FDIC v. World Univ. Inc.,* 978 F.2d 10, 13–14 (1st Cir.1992) (pre-*O'Melveny* case).

■ The applicable Maine law, set forth in the Maine Uniform Commercial Code, Negotiable Instruments, 11 M.R.S.A. 3–1101 *et seq.,*[3] provides that a note qualifying as a negotiable instrument can be enforced by "holder[s]" and "nonholder[s] in possession of the instrument who [have] the rights of [ ] holder[s]." *See* 11 M.R.S.A. § 3–1301.[4] The

---

2. FIRREA is the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, 103 Stat. 183, codified in various sections of 12 and 18 U.S.C.

3. The Maine Uniform Commercial Code was amended in 1993, after the execution of the Note but before the execution of the Conditional Agreement and before the institution of the lawsuit in question. The earlier version of the Maine Uniform Commercial Code, Negotiable Instruments, was codified at 11 M.R.S.A. § 3–101, *et seq.* (repealed in 1993).

Both parties have taken the position in this litigation that the Note is a negotiable instrument (the Houdes in their appellate brief, and the FDIC in motions submitted to the district court), and neither party has argued that the Note is not a negotiable instrument even though, with its variable interest rate, the Note is arguably not a negotiable instrument under the pre–1993 version of the Maine Uniform Commercial Code.

*See e.g., FSLIC v. Griffin,* 935 F.2d 691, 697 n. 3 (5th Cir.1991), *cert. denied,* 502 U.S. 1092, 112 S.Ct. 1163, 117 L.Ed.2d 410 (1992); *New Conn. Bank & Trust Co., N.A. v. Stadium Management Corp.,* 132 B.R. 205, 208–09 (D.Mass.1991). In the absence of an applicable statute, the FDIC's initial burden would be subject to Maine common law. In discerning the common law requirements for the FDIC to show that it is entitled to enforce the variable interest rate Note, we would be inclined to look to the statutory requirements for enforcing negotiable instruments by analogy. As the parties have not argued otherwise and as it is hard to see how the outcome of this case would change in any event, we proceed on the assertion that the Note is a negotiable instrument under Maine law.

4. The version of the Maine Uniform Commercial Code in effect before 1993 also provided that holders as well as transferees with the rights of holders could enforce a negotiable instrument.

FDIC is plainly not a "holder" under Maine law because the Note was not indorsed to the FDIC and therefore was not "negotiated."[5] *See* 11 M.R.S.A. § 3–1201 ("[I]f an instrument is payable to an identified person, negotiation requires transfer of possession of the instrument and its indorsement by the holder.");[6] *see also Calaska Partners Ltd. v. Corson*, 672 A.2d 1099, 1104 (Me.1996) (holding that holder in due course status is not conferred when financial instruments are transferred in bulk to the FDIC).

■ Not being a holder, the FDIC had to show, as a prerequisite to enforcing the Note against the Houdes, that it was a transferee in possession entitled to the rights of a holder. *See* 11 M.R.S.A. § 3–1203. Comment 2 following § 3–1203 provides:

> If the transferee is not a holder because the transferor did not indorse, the transferee is nevertheless a person entitled to enforce the instrument . . . if the transferor was a holder at the time of transfer. . . . Because the transferee is not a holder, there is no presumption . . . that the transferee, by producing the instrument, is entitled to payment. The instrument, by its terms, is not payable to the transferee and the transferee must account for possession of the unindorsed instrument by proving the transaction through which the transferee acquired it. *Proof of a transfer to the transferee by a holder is proof that the transferee has acquired the rights of a holder.* At that point the transferee is entitled to the presumption. . . .

(emphasis added).[7] Thus, in order minimally to be entitled to the presumption under Maine law that it could enforce the Note, the FDIC was required (1) to prove a sufficient transfer from a holder (here MNB, to which the Note was made payable by the Houdes) to the FDIC in its present capacity as receiver of NMNB, and (2) to produce the Note at trial.

## 2. The Evidence At Trial

The FDIC brought this action in its capacity as receiver for NMNB. The NMNB was allegedly a bridge bank set up pursuant to 12 U.S.C. § 1821(n) by the FDIC following the

---

*See* 11 M.R.S.A. § 3–201, Comment 8 (repealed 1993).

5. The federal holder in due course doctrine, which provides a buffer for the FDIC against certain defenses, does not give the FDIC the status of a "holder" in the instant situation. This Circuit has held that the federal doctrine is generally not applicable to the FDIC in its receivership capacity. *See Capitol Bank & Trust Co. v. 604 Columbus Ave. Realty Trust (In re 604 Columbus Ave. Realty Trust )*, 968 F.2d 1332, 1352–53 (1st Cir.1992) (stating that the federal holder in due course doctrine does not apply to the FDIC as receiver except in the case of a purchase and assumption transaction); *see also FDIC v. Laguarta*, 939 F.2d 1231, 1239 n. 19 (5th Cir.1991) (same). *But see Campbell Leasing, Inc. v. FDIC*, 901 F.2d 1244, 1249 (5th Cir.1990) (stating that the FDIC may enjoy federal holder in due course status whether acting in its corporate or receivership capacity); *Firstsouth, F.A. v. Aqua Constr., Inc.*, 858 F.2d 441, 443 (8th Cir.1988) (providing FSLIC–Receiver with federal holder in due course status).

We note that the continuing viability of the federal holder in due course doctrine is questionable. A circuit split has arisen as to whether the doctrine is still valid after *O'Melveny & Myers*, *supra*. Compare *DiVall Insured Income Fund Ltd. Partnership v. Boatmen's First Nat'l Bank of Kansas City*, 69 F.3d 1398, 1402 (8th Cir.1995) *and Murphy v. FDIC*, 61 F.3d 34, 38 (D.C.Cir. 1995) (holding that *O'Melveny & Myers* leaves no room for common law *D'Oench* doctrine) *with Motorcity of Jacksonville v. Southeast Bank N.A.*, 83 F.3d 1317, 1327–28 (11th Cir.1996). This court has not yet expressed an opinion as to the effect of *O'Melveny & Myers* on the doctrine.

In any event, the present case does not present a situation for which the doctrine was created. The federal holder in due course doctrine is designed to protect the FDIC from claims unascertainable from the books of the failed institution, a purpose unrelated to the present.

6. The term "negotiation" is similarly defined in the pre–1993 statute, 11 M.R.S.A. § 3–202 (repealed in 1993).

7. The result would not be different under the pre–1993 version of the Maine Uniform Commercial Code which provided:

> [T]he transferee without indorsement of an order instrument is not a holder and so is not aided by the presumption that he is entitled to recover on the instrument. . . . The terms of the obligation do not run to him, and he must account for his possession of the unindorsed paper by proving the transaction through which he acquired it. *Proof of a transfer to him by a holder is proof that he has acquired the rights of a holder and that he is entitled to the presumption.*

11 M.R.S.A. § 3–201, Comment 8 (repealed in 1993).

failure of MNB. The FDIC produced the Note at trial, and the parties stipulated that the signatures were authentic and that the instrument the FDIC possessed was the original. What remained, therefore, was for the FDIC to establish a proper transfer of the Note to it in its suing capacity (receiver of NMNB) from the Note's holder, MNB.

■ The first step in this transfer could rather easily have been established given the provisions of FIRREA. A transfer of all the holder's (MNB's) rights in the Note to the FDIC as receiver for MNB could be demonstrated simply by showing that the FDIC became the receiver of MNB. Once a receivership of a failed bank takes place, the transfer of the failed bank's assets to the FDIC occurs by operation of law—the FDIC as receiver of a failed institution succeeding under federal law to:

> (i) all rights, titles, powers, and privileges of the insured depository institution, . . .

> (ii) title to the books, records, and assets of any previous conservator or other legal custodian of such institution.

12 U.S.C. § 1821(d)(2)(A).

■ The most serious problem in the instant case is what additional proof is needed to prove that enforceable title to the Note was transmitted to the FDIC in its subsequent and present capacity as *receiver of the bridge bank, NMNB*. Under the Maine negotiable instruments law, there has to be "[p]roof of a transfer to the transferee by a holder" of the Note, establishing "proof that the transferee [i.e., the FDIC as receiver of NMNB] has acquired the rights of a holder [MNB]." 11 M.R.S.A. § 3–1203, Comment 2, *supra*. As stated above, if the FDIC were suing in the capacity of receiver of MNB, nothing more would be required than a showing of such receivership, coupled with a production of the Note, for the FDIC to become entitled to the presumption that it was entitled to payment. But the FDIC is suing as receiver of a different entity, NMNB. There is no automatic transfer provided by federal law of the assets of the FDIC as receiver of a failed bank to a bridge bank, nor is there an automatic transfer from a bridge bank back to the FDIC upon the termination of the bridge bank. *See* 12 U.S.C. § 1821(n).

■ A key question, therefore, is whether the record below properly established the formation of NMNB, the transfer of the Note to NMNB, the demise of NMNB and the appointment of the FDIC as its receiver, and the transfer of the Note from NMNB to the FDIC as receiver of that entity. The FDIC relied on the testimony of its witness, Golden, to show this. Golden testified, among other things, to the FDIC's receivership of MNB, the creation of NMNB, the subsequent dissolution of NMNB, and the Note's transfer to the FDIC as NMNB's receiver. The court, however, struck Golden's testimony. We agree with the court that Golden, having taken over the Houde file only two weeks before trial and not claiming direct personal knowledge of these events, could not testify to them over objection. *See* Fed. R.Evid. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.") Although, as custodian of the Houde file, his testimony might well have been sufficient to authenticate business records, admissible under an exception to the hearsay rule, that may have proved the underlying transactions, *see* Fed.R.Evid. 803(6), the FDIC did not have any of the underlying documents with it at trial. Nor was the FDIC prepared to offer public records such as might establish the appointment of the FDIC as receiver of MNB and NMNB respectively. *See* Fed. R.Evid. 803(8), 901(b)(7) (indicating that public records are admissible as an exception to the hearsay rule and generally self-authenticating). Thus, the FDIC was without admissible evidence of its ownership of the Note. The FDIC conceded that it was unprepared at the time to present alternative evidence after Golden's testimony was struck, although it said it could obtain the relevant evidence if the court would grant a brief continuance. Without such a foundation, the court declined to permit the Note to be received into evidence. Without the Note in evidence, the FDIC felt that it could not

proceed.[8]

■ Attempting to justify the lack of admissible foundation evidence, the FDIC now argues that because the Note was never indorsed and never made payable to anyone other than MNB, it plainly could not have been sold to a third party by the FDIC or the bridge bank. But while the absence of an indorsement on the Note strengthens the argument that no one acquired a title superior to that of the FDIC, it does not by itself meet the FDIC's burden to "account for possession of the unindorsed instrument by proving the transaction through which the transferee acquired it." 11 M.R.S.A. § 3–1203, Comment 2, *supra*.

■ We note that the Houdes, in their Statement of Undisputed Material Facts submitted to the district court in conjunction with their earlier summary judgment motion, conceded that the FDIC was appointed receiver for MNB, that the FDIC created NMNB, that the FDIC appointed itself the receiver of NMNB, and that "[i]t was through these various transactions that the FDIC acquired the Note ... at issue in this action." The Houdes' subsequent facile recanting of this admission might arguably be the sort of "fast and loose" play which leads a court to impose judicial estoppel. *See Patriot Cinemas, Inc. v. General Cinema Corp.*, 834 F.2d 208, 212 (1st Cir.1987). However, the FDIC made no effort during the trial to offer the Houdes' Statement in evidence in order to establish its own ownership of the Note, nor did it make an estoppel argument.[9]

In a case such as this with well over a hundred docket entries, the district court can scarcely be expected to recall, sua sponte, a fact listed in one document submitted by the Houdes to the court. Moreover, although the FDIC mentions the Houdes' admission in its appellate brief, it does not make a "judicial estoppel" argument, or indeed any other coordinated argument, as to why the admission should, at this late date, be binding on the Houdes. *See United States v. Caraballo–Cruz*, 52 F.3d 390, 393 (1st Cir.1995) (stating that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived") (internal quotations omitted). Given the FDIC's failure to raise the matter in a timely fashion before the district court and to argue the matter on appeal, we regard it as having been waived.

■ The FDIC also argues that this court should now take judicial notice of the failure of MNB and the taking over of its assets by the FDIC. This point was also not made at trial below, the district court never being asked to take judicial notice of these facts. It is true that the appointment of the FDIC as receiver of MNB was previously announced and relied upon as a matter of fact in two published opinions of this court issued prior to the district court proceeding under review, as well as in several prior opinions of the District of Maine, including opinions issued by the very judge who presided over the present trial.[10] Nonetheless,

**8.** After a lengthy discussion in which the court indicated that there was insufficient evidence of foundation to allow the Note into evidence and that even if the FDIC were to provide additional documentation and witnesses to lay the proper foundation, it would be in violation of the court's Final Pretrial Order, the court declined to grant a continuance. The following colloquy then took place:

[FDIC's Counsel]: Then, your Honor, we have no further witnesses.

THE COURT: I take it the Plaintiff rest [sic] at this time?

[FDIC's Counsel]: Yeah.

THE COURT: Does the defendant rest?

[Houdes' Counsel]: Defendant rest [sic] on the complaint and moves for directed verdict.

**9.** The FDIC did indicate to the court, several hours after the court directed the verdict for the

Houdes, that it would file a motion for reconsideration of the verdict because "there were judicial binding admissions" submitted by the Houdes. The district judge indicated that he would not reconsider the decision because the FDIC should have been prepared to argue that point at trial. The FDIC did not submit a motion for reconsideration. Moreover, the FDIC makes no argument on appeal that the district court's refusal to reconsider was an abuse of discretion.

**10.** *See, e.g., United States v. Fleet Bank of Maine*, 24 F.3d 320, 322 (1st Cir.1994) (reviewing a decision of the district court judge who decided the present case, the Court of Appeals stated: "In January 1991, the Maine National Bank ... was declared insolvent and the Federal Deposit Insurance Corporation ... was appointed its receiver."); *Bateman v. FDIC*, 970 F.2d 924, 926 (1st Cir.1992) (reviewing a decision of the district

the FDIC's judicial notice argument fails for several reasons. First, even assuming a court could take judicial notice of the failure of the MNB, no party in this case requested the court to take such action. While the district court might well have taken judicial notice of these well-known facts sua sponte, it was not required to do so unless requested. *See* Fed.R.Evid. 201(c), (d). Second, even assuming the district court, or this court on appeal, did take judicial notice of the failure of the MNB, the appointment of the FDIC as its receiver, and perhaps even the creation of the bridge bank, these facts would not relieve the FDIC from its burden of showing a transfer of the Note from the bridge bank to the FDIC as receiver for that institution. These are not matters for judicial notice.

We conclude, therefore, with some regret, that there was no error in the district court's ruling that, on the record as it stood, the FDIC had failed to meet its legal burden. We hold that the record justified the dismissal of the case as matter of law on the narrow but dispositive ground declared by the district court.

### 3. The Denial of the FDIC's Requested Continuance

█ The FDIC argues that even assuming the FDIC as receiver of NMNB failed to make out a prima facie case showing the transactions by which it acquired the Note, the court's refusal to grant the FDIC a continuance during which it could procure the necessary records and other evidence constituted an abuse of discretion. We review the district court's refusal to grant a continuance solely for an abuse of discretion. *See United States v. Neal,* 36 F.3d 1190, 1205 (1st Cir. 1994).

Counsel for the FDIC first asked for a two-hour break and then asked, at 10:30 a.m., that the case be continued until the next day. The district judge indicated that he was not willing to recess the case because "[t]his case should have been prepared weeks ago." In addition, the judge noted that even if he did allow the continuance, any documents or testimony the FDIC produced would not be admissible, over objection, because it would violate the court's Final Pretrial Order, which required a designation of all exhibits and witnesses and a description of the witnesses' testimony. The judge stated:

> I am not going to continue this case, . . . to do so means opening the entire case up, probably discharging this jury so that new procedures, pretrial procedures about these documents can be carried out in accordance with the prior order of the court. It would make a complete mockery of the systematic pretrial preparation of cases and the elaborate procedure that the Court has in place to see that these cases are properly tried.

█ When reviewing a district court's decision to deny a continuance, broad discretion must be granted and only "unreasonable and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay" will necessitate reversal. *United States v. Rodriguez Cortes,* 949 F.2d 532, 545 (1st Cir.1991) (citing *United States v. Torres,* 793 F.2d 436, 440 (1st Cir.), *cert. denied,* 479 U.S. 889, 107 S.Ct. 287, 93 L.Ed.2d 262 (1986)); *see also Morris v. Slappy,* 461 U.S. 1, 11, 103 S.Ct. 1610, 1615, 75 L.Ed.2d 610 (1983). In determining whether a denial of a continuance constitutes an abuse of discretion, the court must consider the particular facts and circumstances of each case. *See Torres,* 793 F.2d at 440. The court should consider the reasons in support of the request, the amount of time requested, whether the movant has contributed to his predicament, the inconvenience to the court, the witnesses, the jury and the opposing party, and the likelihood of injustice or unfair prejudice attributable to the denial of a continuance. *See United States v. Saccoccia,* 58 F.3d 754, 770 (1st Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1322, 134 L.Ed.2d 474 (1996).

court judge who decided the present case, Court of Appeals stated: "[I]n January 1991, the federal Comptroller of the Currency declared the [Maine National] Bank insolvent and appointed the FDIC as receiver."); *Mill Invs. v. Brooks Woolen Co.,* 797 F.Supp. 49, 50 (D.Me.1992) (acknowledgement of same district court judge that FDIC was appointed receiver of MNB); *Cardente v. Fleet Bank of Maine,* 796 F.Supp. 603, 606 n. 1 (D.Me.1992) (same).

The FDIC argues that the district court's refusal to grant a continuance led to injustice and unfair prejudice. It contends that the time needed to gather the necessary evidence would not have greatly inconvenienced the court, the jury or the Houdes, and that some of the documents would have been self-authenticating records admissible in court. This may be so, but it overlooks a number of factors pointing in the other direction, among them the presence of the jury and the court's reasonable expectation that the FDIC would be prepared for trial. The FDIC contends that it was "surprised" that it had to put forth admissible evidence concerning its ownership of the Note. However, we see no reason for the FDIC to have been surprised. The Houdes had challenged the ability of the FDIC to enforce the Note as an affirmative defense in their answer and had later objected to the FDIC's motion, which the court denied, to preclude them from challenging the FDIC's standing to enforce the Note. The FDIC was plainly on notice that it was dealing with adversaries who refused to take a relaxed "common sense" approach on these technical but nonetheless requisite preliminaries. Indeed, the FDIC showed that it understood its burden by calling Golden and questioning him on the matters it did. Unfortunately, it seems not to have recognized the hearsay problem inherent in Golden's testimony, nor to have taken the trouble to have with it the necessary supporting documents.

The court was entitled to expect the FDIC to have special competence in actions such as this. This suit had been commenced ten months earlier and, as said, the FDIC knew the Houdes would challenge its standing to enforce the Note. It was the FDIC's failure to have prepared its case for trial that led to the request for a continuance. While the court's action was strict, and we can imagine some judges who would have assessed the situation more charitably to the FDIC, we cannot say that it abused its discretion in not giving the FDIC additional time to remedy its lack of preparation. *See, e.g., Rodriguez Cortes,* 949 F.2d at 545 (holding that district court did not abuse its discretion in denying motion for continuance in order to obtain witness to testify that time indicated on hotel registration card was incorrect when defendant had been in possession of the time card for six months and had ample time to obtain a witness). Given the costs of trials, especially before juries, and the adverse effects of delay in one case on other litigants seeking trials, judges must be allowed a considerable discretion in these matters. We find no abuse here.

### III.

Because we find that the district court properly directed a verdict in favor of the Houdes and acted within its discretion in denying the FDIC's request for a continuance, we need not reach the issues raised in the Houdes' cross-appeal.

*Affirmed.*