10-1781-cv
USA v. Twenty Miljam-350 IED Jammers

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2010

(Argued:  April 13, 2011                                      Decided:  December 22, 2011)

Docket No. 10-1781-cv

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

- v. -

TWENTY MILJAM-350 IED JAMMERS,

Defendant-in-rem,

ALON WALLACH,

Claimant-Appellant.

_____

Before:  KEARSE and CHIN, Circuit Judges, RAKOFF, District Judge[*].

Appeal from a judgment of the United States District Court for the Southern District of New York, Lewis A. Kaplan, Judge, ordering the forfeiture of certain communication-jamming devices to the United States pursuant to 22 U.S.C. § 401(a).

Affirmed.

---

[*]     Honorable Jed S. Rakoff, of the United States District Court for the Southern District of New York, sitting by designation.

JESSE M. FURMAN, Assistant United States Attorney, New York, New York (Preet Bharara, United States Attorney for the Southern District of New York, Jason P. Hernandez, Assistant United States Attorney, New York, New York, on the brief), for Plaintiff-Appellee.

Alon Wallach, Rosh Ha Ayin, Israel, Claimant-Appellant pro se, submitted a brief.

KEARSE, Circuit Judge:

Claimant Alon Wallach appeals from a judgment of the United States District Court for the Southern District of New York, Lewis A. Kaplan, Judge, ordering the forfeiture to plaintiff United States, pursuant to 22 U.S.C. § 401(a), of certain communication-jamming devices, to wit, the defendant-in-rem Twenty Miljam-350 IED Jammers (the "Jammers"), owned by Wallach and a company of which he was the majority shareholder and chief executive officer ("CEO"). The district court dismissed Wallach's claim challenging the requested forfeiture, ruling that Wallach lacked standing to interpose such a challenge because, following the dismissal of criminal charges against him, he had, inter alia, stipulated that he would not contest such a forfeiture. On appeal, Wallach contends that the court erred in dismissing his claim, arguing principally that the stipulation he signed was void on the grounds that it was signed under duress and without consideration. For the reasons that follow, we disagree and affirm the judgment of the district court.

# I. BACKGROUND

The following facts, drawn from the record in the district court and the parties' submissions on appeal, do not appear to be in dispute.

A. <u>The Jammers, the Prosecution of Wallach, and the Stipulation</u>

Wallach, a former Israeli military officer who resides in Israel, was the majority shareholder, CEO, and chief engineer of Wireless Avionics ("Wireless"), an Israeli electronics company that made and sold, <u>inter alia</u>, components for devices capable of interfering with the electronic signals used to detonate improvised explosive devices ("IEDs"). These interference devices--called "jammers"--are also capable of disabling other electronic communications equipment, such as that used by the armed forces of the United States and the North Atlantic Treaty Organization ("NATO").

The Arms Export Control Act, 22 U.S.C. § 2751 <u>et seq.</u>, gives the President of the United States authority to "control the import and the export of defense articles[,] . . . to designate those items which shall be considered as defense articles[,] . . . and to promulgate regulations for the import and export of such articles." 22 U.S.C. § 2778(a)(1). Items so designated "constitute the United States Munitions List," <u>id</u>. Authority to designate items as defense articles for such a list (the "USML") has been delegated to the State Department, <u>see</u> 22 C.F.R. § 120.1(a), which has determined that an article may be designated a defense article if it:

> (a) Is specifically designed, developed, configured, adapted, or modified for a military application, and

> (i) Does not have predominant civil applications, and

> (ii) Does not have performance equivalent (defined by form, fit and function) to those of an article or service used for civil applications; or

(b) Is specifically designed, developed, configured, adapted, or modified for a military application, and has significant military or intelligence applicability such that control under this subchapter is necessary,

22 C.F.R. § 120.3 (a)-(b).

Any individual or entity--other than an officer or employee of the United States government in his or her official capacity--who is "in the business of manufacturing, exporting, or importing any defense articles" is required to register with the State Department, 22 U.S.C. § 2778(b)(1)(A)(i); and items listed on the USML may not lawfully be exported from or imported into the United States without a license issued by the State Department's Directorate of Defense Trade Controls ("DDTC"), see id. § 2778(b)(2); 22 C.F.R. § 120.1(b)(2)(i). Any willful violation of § 2778 or of any rule or regulation issued thereunder is a felony, the penalty for which, in 2009, was imprisonment for up to 10 years and/or a fine of up to $1,000,000. See 22 U.S.C. § 2778(c) (2006).

1. The Arrest of Wallach and the Criminal Complaint

On March 13, 2009, Wallach was arrested by agents of the Department of Homeland Security, Immigration and Customs Enforcement ("ICE"), and charged with attempting and conspiring to export items listed on the USML, to wit the Jammers, without a license or other written authorization from the State Department, in violation of 22 U.S.C. § 2278(b)(2) and 18 U.S.C. § 371. The criminal complaint, filed against him in the United States District Court for the Southern District of New York ("March 2009 Complaint" or "Criminal Complaint"), alleged that Wallach and Wireless had provided components to a company in New Jersey ("NJ Company") for the manufacture of the Jammers and that the Jammers were expected to be sold to NATO, which had signed a purchase order

-4-

for the Jammers in February 2008. (See March 2009 Complaint ¶¶ 7(b)-(c).) It alleged that DDTC, in March 2008, had denied the NJ Company an export license for the Jammers on the ground that they could interfere with existing equipment being used by United States forces in Afghanistan. (See id. ¶ 7(b).)

The Criminal Complaint alleged that, after DDTC refused to grant the necessary export license to the NJ Company, Wallach urged the NJ Company's owner--who was an ICE confidential source ("CS")--to transfer the Jammers to Wallach's possession so that Wallach could sell them to a third party outside of the United States. (See id. ¶¶ 3(a), 7, 7(c).) It alleged that Wallach told the CS that Wallach "was willing to sell the MILJAM-350 IED Jammers to any third party who was willing to buy them." (Id. ¶ 7(c).)

The Criminal Complaint alleged that the CS provided ICE with documents relating to his business dealings with Wallach and allowed ICE to record telephone conversations with Wallach. On March 13, 2009, the CS, in New York City, had several recorded conversations with Wallach in preparation for the finalization of Wallach's purchase of the Jammers. Later that day, Wallach, the CS, and an ICE undercover agent met at the NJ Company's warehouse. Wallach stated that he wanted to ship the Jammers first to a United States location--which he refused to disclose--where he and another person would disassemble them for shipment of the components to Israel and Turkey, where the Jammers could be reassembled. (See March 2009 Complaint ¶ 8(b).) The Criminal Complaint alleged that:

> c. The CS advised WALLACH that he should get an export license before shipping the MILJAM-350 IED Jammers overseas, and discussed the fact that an export license required the exporter to designate an end user. WALLACH proposed that he fabricate the name of the end user or simply mislabel the equipment as a civilian product.

d. WALLACH advised that the end users of the twenty MILJAM-350 IED Jammers in question might be in Iraq, and that he had numerous customers in the Middle East region. The CS asked WALLACH why he did not get an export license. WALLACH responded that he could not get one.

e. WALLACH asked the CS why he (the CS) did not sell the MILJAM-350 IED Jammers to overseas customers. The CS responded that he (the CS) could not get an export license. WALLACH then stated that this was why his customers came to him for the MILJAM-350 IED Jammers.

(March 2009 Complaint ¶¶ 8(c)-(e).)

After the meetings on March 13 between Wallach and the CS, Wallach was arrested. Several days later, ICE agents seized the Jammers from the NJ Company's warehouse.

### 2. The Stipulation and the Dismissal of the Criminal Complaint

On July 9, 2009, on motion of the government, the Criminal Complaint against Wallach was dismissed, without prejudice. On July 10, 2009, Wallach and Wireless entered into an agreement with the government that provided, in pertinent part, as follows:

WHEREAS, on or about March 13, 2009, Alon Wallach ("Wallach") was arrested by special agents of the United States Department of Homeland Security, Immigration and Customs Enforcement ("ICE"), and thereafter charged in a criminal complaint, United States v. Alon Wallach, 09 Mag. 698 (S.D.N.Y.) ("Criminal Complaint"), which was dismissed without prejudice on or about July 9, 2009;

WHEREAS, on or about March 19, 2009, twenty MILJAM-350 IED Jammers (the "Jammers") were obtained by ICE from the New Jersey premises of Integrated Security Solutions, LLC, in connection with the investigation that gave rise to the Criminal Complaint;

WHEREAS, Wallach is the Chief Executive Officer and majority owner of Wireless Avionics, Ltd.;

WHEREAS, Wallach and Wireless Avionics represent and agree that Wallach and Wireless Avionics are the sole owners of the Jammers by virtue

-6-

of the Assignment and Release Agreement dated March 13, 2009, entered into between Integrated Security Solutions, LLC and Wireless Avionics . . . .

WHEREAS, Wallach and Wireless Avionics agree that they will not contest the forfeiture of the Jammers to the United States.

IT IS HEREBY STIPULATED AND AGREED:

1. Wallach and Wireless Avionics, Ltd., agree not to contest the administrative or judicial forfeiture of the Jammers to the United States and will not assist a third party in asserting a claim to the Jammers in any forfeiture proceeding.

2. Wallach and Wireless Avionics are hereby barred from asserting any claim against the Government, ICE agents and employees of the Government and ICE in connection with Wallach's arrest on March 13, 2009, the acquisition and/or possession of the Jammers, including but not limited to any claim that there was no probable cause for his arrest and/or no proper basis for the acquisition of the Jammers by ICE.

3. Wallach and Wireless Avionics further agree to hold harmless the Government, ICE and any and all of the Government's ICE's agents and employees from any and all claims arising from any acts, incidents, or occurrences in connection with the acquisition and/or possession of the Jammers, including but not limited to any third-party claims of ownership of the Jammers.

4. This Stipulation and Release constitutes the complete agreement between the parties hereto and may not be amended except by written consent thereof.

(Stipulation and Release dated July 10, 2009 ("Stipulation"), WHEREAS ¶¶ and ¶¶ 1-4 (emphases added).)  The Stipulation was executed by Wallach on behalf of himself and Wireless and by Wallach's defense attorney.

B. The Forfeiture Proceedings

In October 2009, the government filed its verified complaint in the present civil forfeiture action ("October 2009 Complaint" or "Forfeiture Complaint"), seeking a decree that the Jammers seized by ICE from the premises of the NJ Company on or about July 19, 2011, were forfeited to the United States pursuant to 22 U.S.C. § 401(a). That section provides in pertinent part, as follows:

> Whenever an attempt is made to export or ship from or take out of the United States any . . . articles in violation of law, . . . the Secretary of the Treasury, or any person duly authorized for the purpose by the President, may seize and detain such . . . articles . . . . All . . . articles . . . seized pursuant to this subsection shall be forfeited.

22 U.S.C. § 401(a) (emphasis added).

The Forfeiture Complaint alleged that the Jammers had been seized in connection with the investigation that led to the Criminal Complaint against Wallach alleging that he had attempted and conspired to export the Jammers from the United States without having obtained from the State Department a license or other written authorization for such export. (See October 2009 Complaint ¶¶ 4-8.) The Forfeiture Complaint alleged that the Criminal Complaint had been dismissed without prejudice on July 9, 2009, and that on July 10, 2009, Wallach and Wireless entered into the Stipulation, agreeing to the forfeiture of the Jammers. (See October 2009 Complaint ¶¶ 9-10.)

Wallach filed a claim opposing the requested forfeiture. (See Statement of Interest or Right dated November 17, 2009 ("Interest Statement"); Answer to Civil Complaint for Forfeiture In Rem dated December 9, 2009 ("Answer" or "Wallach Answer").) Wallach asserted, inter alia, that "**IED** jammers [we]re **not** listed in any **USML** category, and certainly **not** with Miljam-350 model number" (Interest Statement at 1 (emphases in original); see Answer at 5-6, First Affirmative

-8-

Defense); he argued that there was a "misclassification [that] is a result of the misinterpretations of many people" (Answer at 5, First Affirmative Defense); and he contended that "[t]he property should be returned to its lawful owner that did nothing wrong" (Interest Statement at 1).

Wallach also challenged the validity of his Stipulation.  He asserted that

> [t]he stipulation agreement attached to this civil forfeiture complaint was signed by me under duress and is therefore void.  I was held in the US against my will without my passport when the criminal complaint was dismissed, after 4 months of house arrest, and had no other choice but to sign it or risk another baseless charge.

(Id.; see Answer ¶ 10.)  His Answer asserted also that the Stipulation "should not be considered valid" because it had not been authorized by Wireless's directors and shareholders; because "the stipulation agreement is entirely one sided, giving no consideration whatsoever to WALLACH and/or Wireless Avionics in return for the release of the Defendant Property"; and because "WALLACH signed under extreme duress" in order to prevent the failure of his business and to protect his marriage, his home, and his family.  (Answer ¶ 10.)   Wallach stated that he had been

> informed by his lawyer . . . that the US government would expect some kind of consideration for their loss of face in dismissing [the criminal] case outright. Further he said to WALLACH that he should consider himself lucky to be extricated from his legal ordeal without a trial--all this notwithstanding that Wallach was completely innocent. Since the government was still looking into the jammers issue, [Wallach's lawyer] convinced WALLACH that if he did not sign a stipulation agreement, the government would find another pretext for charging him with a civil charge that would in all likelihood keep WALLACH in the US for additional 6 months with incurrence of additional legal costs in the order of $100k in legal fees.

(Id.)

In opposition to Wallach's claim, the government, pursuant to Rule G(8) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions (hereinafter "Forfeiture Action Rules"), filed a Motion To Strike or for Summary Judgment on the ground that the Stipulation "deprived [Wallach] of the legal interest in the Jammers he needs under Article III of the U.S. Constitution to contest the forfeiture of the Jammers." (Memorandum of Law of Plaintiff United States of America in Support of its Motion To Strike or for Summary Judgment ("Government Memorandum") at 1-2.) Those Rules provide, in pertinent part, that in a forfeiture action in rem arising from a federal statute, "[a] claimant who establishes standing to contest forfeiture may move to dismiss the action," Forfeiture Action Rule G(8)(b)(i) (emphasis added), and that "the government may move to strike a claim or answer" at any time before trial on the ground that "the claimant lacks standing," id. Rule G(8)(c)(i)(B). The government's motion to strike may be in the form of one for summary judgment, see id. Rule G(8)(c)(ii)(B); and the motion "must be decided before any motion by the claimant to dismiss the action," id. Rule G(8)(c)(ii)(A).

The government attached to its motion, inter alia, the July 10, 2009 Stipulation and quoted principally the fifth WHEREAS paragraph and the paragraphs numbered 1 and 2 (see Part I.A.2. above), in which Wallach and Wireless agreed that they would not assert any claim against the government in connection with the acquisition or possession of the Jammers and agreed not to contest forfeiture of the Jammers to the government. The government argued that the Stipulation thus

> deprived [Wallach] of the legal interest in the Jammers he needs under Article III of the U.S. Constitution to contest the forfeiture of the Jammers. Wallach should not now be allowed to set aside the agreement he signed with the Government because he has had a change of heart.

(Government Memorandum at 1-2.)

In addition, the government attached to its motion an email sent by Wallach to Assistant United States Attorney ("AUSA") David Massey on September 18, 2009 ("Wallach Email"). In that email, Wallach sought Massey's help in obtaining "papers" and "documents" he "need[ed]" (Wallach Email ¶¶ 10, 11) in order to (a) have "the DDTC mistake" with respect to USML classification of his Jammers "correct[ed]" (id. ¶ 9), and (b) pursue a civil suit against the CS (see, e.g., id. ¶¶ 5, 7, 9, 10). Noting that the Stipulation he signed did not bar him from suing the CS or the CS's companies (see id. ¶ 5), Wallach discussed that Stipulation, in part, as follows:

> Lev Dassin, the acting district [sic] attorney of the Southern District of New York signed a stipulation and release agreement with me, 5 days AFTER the case was dismissed. I did not have to sign it, and in fact I was practically free when I did sign. Even if I wouldn't have signed, I could have left back home, and you should have even given me my 20 jammers. This retroactive confiscation of the jammers was also illegal and "a blow under the belt", but I agreed to it as well[.]

> 5) According to my attorney's advice, I signed it after all, in order to get out of the US in peace . . . .

(Wallach Email ¶¶ 4-5 (emphases added).) And although accusing the government of acting negligently or maliciously in prosecuting him on the basis of information from the CS (see, e.g., id. ¶ 3, 7), Wallach stated, "I have no intentions to put anyone from your department or ICE in a difficult situation, and I will honor what I signed" (id. ¶ 9 (emphasis added)).

Thus, the government argued that Wallach not only had waived any right to challenge forfeiture when he signed the Stipulation in July 2009, but also had reaffirmed that waiver, confirming the voluntary and counseled nature of his action, in his email to the government in September 2009. The government therefore contended that

> Wallach cannot establish standing to contest the forfeiture because he abandoned his possessory and ownership interest in the Jammers when he agreed not to contest the

forfeiture. . . . Nor can Wallach show any injury to himself because he agreed to abandon his interest in the Jammers. . . . The Court should, therefore, strike Wallach's claim or grant the Government summary judgment.

(Government Memorandum at 15.)

The government submitted a Local Civil Rule 56.1 statement of undisputed material facts in support of summary judgment, setting out, inter alia, the above statements by Wallach. The government also gave Wallach, as a pro se litigant, notice of the nature of a motion for summary judgment and the effect of failing to make a proper response, see Vital v. Interfaith Medical Center, 168 F.3d 615, 620-21 (2d Cir. 1999).

Wallach opposed the government's motion, submitting, inter alia, a Claimant's Opposition to Plaintiff's Motion To Strike or for Summary Judgment, dated February 18, 2010 ("Wallach Opposition Memorandum"), and a supporting affidavit dated February 17, 2010 ("Affidavit" or "Wallach Aff."). In these papers, aside from outlining the background of his commercial efforts and the controversy between him and the companies with which he had been dealing (see Wallach Aff. ¶¶ 3-28), and describing the course of the criminal case (see id. ¶¶ 29-37), Wallach principally reiterated his contention that he had signed the Stipulation under duress (see, e.g., id. ¶¶ 39(c), 40, 44; Wallach Opposition Memorandum at 2-5, 10). In response to the Government's Rule 56.1 statement, Wallach admitted that he had signed the Stipulation and that he had sent the email attached to the government's moving papers; but he argued that his statements were either made under duress or taken out of context. As to the basis for his claim of duress, Wallach stated that the electronic monitoring bracelet he had been required to wear while on bail was not removed until 15 hours after he signed the Stipulation and that his travel documents were not returned until six days after the dismissal of the Criminal Complaint. (See Wallach Opposition Memorandum at 4-5.) He

-12-

also contended that the Stipulation was "one-sided" and that it was "not valid" because it had not been "reviewed or sanctioned by any court." (Id. at 2-3.)

The government, in reply, argued that Wallach's arguments were meritless. It pointed out that when the Stipulation was signed, there was no court action pending, and there was thus no requirement that that agreement be reviewed or approved by any court. (See Reply Memorandum of Law of Plaintiff United States of America in Support of its Motion To Strike or for Summary Judgment ("Government Reply Memorandum") at 2-3.) The government also argued that there was no evidence suggesting that the electronic monitoring bracelet or Wallach's travel documents had been used to coerce Wallach to sign the Stipulation. Further, citing New York law (see id. at 5), the government argued that in order for a claimant to prevail on a claim of duress, the contract he claims was coerced must be--but here was not--repudiated "promptly" (see id. at 1, 4, 5, 8-9). Here, far from repudiating his Stipulation promptly, the government argued, Wallach sent an unsolicited email to AUSA Massey--two months after he signed the Stipulation--stating that Wallach "did not have to sign it, that he was practically free when he signed it, that he agreed to sign because his counsel advised him to sign, and that he would honor what he signed" (Government Reply Memorandum at 6), thereby affirming that there had been no duress.

In an Order dated March 1, 2010, the district court granted "[t]he government's motion . . . substantially for the reasons set forth in its moving and reply papers." Final judgment was entered on March 2, 2010, declaring the Jammers forfeited to the United States. This appeal followed.

-13-

## II.  DISCUSSION

On appeal, Wallach does not contend that he had standing to oppose the requested forfeiture if the Stipulation he signed is enforceable.  Rather, he pursues his principal contentions that the Stipulation should be ruled void either on the ground of lack of consideration (see, e.g., Wallach brief on appeal at 18 ("The stipulation agreement is completely single sided and gives nothing to Wallach except his freedom")), or on the ground of duress (see, e.g., id. at 25 ("The evidence of the case demonstrate[s] that the prosecution abused its leverage and imbalance of powers to coerce Wallach to sign an agreement he would never have signed voluntarily without such pressure.")).  Reviewing de novo the legal issues as to standing, contract enforceability, and the sufficiency of proffered evidence, we reject Wallach's contentions for the reasons that follow.

Preliminarily, we note our agreement with the government's contention that the enforceability of the Stipulation should be determined with reference to state law, and in particular the law of New York, where the Stipulation was signed by the government and where the criminal case centering on the Jammers had been pending.  There is no federal statute governing such agreements, and "'[t]here is no federal general common law,'" O'Melveny & Myers v. FDIC, 512 U.S. 79, 83 (1994) (quoting Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938)).  "'[C]ases in which judicial creation of a special federal rule would be justified . . . are . . . "few and restricted,"'" Atherton v. FDIC, 519 U.S. 213, 218 (1997) (quoting O'Melveny & Myers, 512 U.S. at 87 (which was quoting Wheeldin v. Wheeler, 373 U.S. 647, 651 (1963))); and cases involving the enforceability of individually negotiated agreements are not among them. Wallach has neither opposed the application of New York law nor proposed a federal principle that would differ from New York law.

-14-

A. Wallach's Challenges to the Enforceability of the Stipulation

1. The Alleged Lack of Consideration

Wallach's contention that the Stipulation is void for lack of consideration is meritless. We note in passing that Wallach attached to his brief on appeal a document that he says was a second email sent to AUSA Massey on October 4, 2009--which does not appear to be part of the record in the district court--in which Wallach accused the government of "seriously violating the understandings and the stipulation agreement that [the government] signed with me and my attorney after my criminal case was dismissed." Were we to consider that document, we would be forced to conclude that Wallach's accusation that the government was not performing its obligations under the Stipulation revealed that there had in fact been consideration for Wallach's signing the Stipulation. However, we need not be concerned with the matter of whether there was consideration, because New York's General Obligations Law provides that

> [a] written instrument which purports to be a total or partial release of all claims . . . or a total or partial release of any particular claim . . . shall not be invalid because of the absence of consideration . . . .

N.Y. Gen. Oblig. Law § 15-303 (McKinney 2010).

All of the prerequisites for application of this section are clearly met in the Stipulation. In that written document--which was titled "Stipulation and Release"--Wallach expressly "agree[d]" that he would "not contest the forfeiture of the Jammers to the United States" (Stipulation, fifth WHEREAS ¶); he expressly "agree[d] not to contest the administrative or judicial forfeiture of the Jammers to the United States" (id. ¶ 1); and he agreed to be "barred from asserting any claim against the Government . . . in connection with . . . the acquisition and/or possession of the Jammers" (id. ¶ 2). These provisions unambiguously released any right Wallach may have had to oppose forfeiture of the

-15-

Jammers to the government. And Wallach has acknowledged that the "stipulation and release agreement" sent to him by the government "call[ed] for [his] **total** renouncement of ownership of the 20 jammers." (Wallach Aff. ¶ 37 (emphasis in original).)

As a matter of New York law, therefore, no consideration for Wallach's agreement to this release was needed; and thus, if consideration was absent, its absence did not make the Stipulation invalid.

2. The Claim of Duress

Wallach's contention that the Stipulation is void on the ground that he entered into it under duress is also untenable.

> The law is well settled that stipulations of settlement are judicially favored and may not lightly be set aside . . . . In general, repudiation of an agreement on the ground that it was procured by duress requires a showing of both [1] a wrongful threat **and** [2] the effect of precluding the exercise of free will . . . .

In re Guttenplan, 222 A.D.2d 255, 256-57, 634 N.Y.S.2d 702, 703 (1st Dep't 1995) (emphases added); see, e.g., Kranitz v. Strober Organization, Inc., 181 A.D.2d 441, 441, 580 N.Y.S.2d 350, 350 (1st Dep't 1992). As indicated, the threat must be "wrongful." Thus, under New York law, the "threatened exercise of a legal right cannot constitute duress . . . ." Marine Midland Bank, N.A. v. Mitchell, 100 A.D.2d 733, 734, 473 N.Y.S.2d 664, 665 (4th Dep't 1984) (internal quotation marks omitted); see, e.g., Stewart M. Muller Construction Co. v. New York Telephone Co., 40 N.Y.2d 955, 956, 390 N.Y.S.2d 817, 817 (1976); Avey v. Town of Brant, 263 N.Y. 320, 322, 189 N.E. 233, 234 (1934). "'[I]t is not duress to threaten to take action which is legally permissible.'" Kamerman v. Steinberg,

891 F.2d 424, 432 (2d Cir. 1989) (quoting Hammelburger v. Foursome Inn Corp., 54 N.Y.2d 580, 593 n.4, 446 N.Y.S.2d 917, 924 n.4 (1981)).

As to the requirement that the wrongful threat have the effect of precluding the exercise of free will, the claimant must show that his acceptance of the contract terms was involuntary "because the circumstances permitted no other alternative." Kamerman v. Steinberg, 891 F.2d at 431; see, e.g., International Halliwell Mines, Ltd. v. Continental Copper & Steel Industries, Inc., 544 F.2d 105, 108 (2d Cir. 1976).

Finally, "[u]nder New York law a contract entered into under duress is generally considered not void, but merely voidable, . . . and one who would repudiate a contract procured by duress must act promptly or will be deemed to have elected to affirm it." Scientific Holding Co. v. Plessey Inc., 510 F.2d 15, 23 (2d Cir. 1974) (emphasis added); see, e.g., DiRose v. PK Management Corp., 691 F.2d 628, 633-34 (2d Cir. 1982) ("the person claiming duress must act promptly to repudiate the contract or release or he will be deemed to have waived his right to do so"); Joseph F. Egan, Inc. v. City of New York, 17 N.Y.2d 90, 98, 268 N.Y.S.2d 301, 305 (1966); In re Guttenplan, 222 A.D.2d at 257, 634 N.Y.S.2d at 703 ("An agreement procured under duress, such as a threat of criminal prosecution, . . . must be promptly disaffirmed or otherwise be deemed to have been ratified . . . .").

> A party may ratify a contract or release entered into under duress by intentionally accepting benefits under the contract, by remaining silent or acquiescing in the contract for a period of time after he has the opportunity to avoid it, or by acting upon it, performing under it, or affirmatively acknowledging it.

VKK Corp. v. National Football League, 244 F.3d 114, 123 (2d Cir. 2001) (internal quotation marks omitted) (emphases added); see also id. at 122.

Wallach's assertions do not meet any part of the test for duress. First, nothing he attributes to the government shows that it made any threat, much less one that was wrongful. He principally invokes the fact that the dismissal of the criminal case against him was "without prejudice." (E.g., Wallach Aff. Exhibit W2, at 4; Wallach Opposition Memorandum at 10; see, e.g., id. at 2; Answer ¶ 10 (Wallach signed the Stipulation "with a threat of a new complaint over his head"); see also Wallach brief on appeal at 25 ("the criminal complaint could be reopened at any time if the government would have decided to do it").) But Wallach did not proffer evidence that the government threatened to reopen the case if he failed to sign. Rather, "the government was still looking into the jammers issue" (Wallach Answer ¶ 10), and a new prosecution is precisely what the "without prejudice" nature of the dismissal gave the government the right to pursue; given that right, the threat of its exercise cannot constitute duress.

Wallach's other arguments, e.g., his statements that his electronic monitoring bracelet was not removed until the morning after he signed the Stipulation (see Wallach Aff. ¶ 41), that he "was held in the US against [his] will without [his] passport when the criminal complaint was dismissed" (Interest Statement at 1), and that his travel documents were not returned to him until five days after he signed the Stipulation (see Wallach Opposition Memorandum at 4) likewise fail to proffer sufficient evidence for a finding of duress. Although Wallach stated that "the government had **forced** my signature of the stipulation agreement in return to my freedom" (Wallach Aff. ¶ 43 (emphasis in original)), and that he "was forced to sign" the Stipulation "to regain [his] liberty" (Wallach Aff. ¶ 44), those statements are conclusory and do not find support in the record. For example, Wallach's own Affidavit stated that "[o]n the morning of July 9, Massey informed my attorney that he had dismissed the criminal complaint, and that a stipulation and release agreement

would be sent by him in one hour for our signature." (Wallach Aff. ¶ 37 (emphases added).) Moreover, emails in the record showed that the AUSA instructed the Pretrial Services Officer that "EM supervision"--i.e., electronic monitoring--of Wallach could be "terminated" and to "close interest in the case" on the morning of July 10 (Supplemental Declaration of [AUSA] Jason P. Hernandez dated February 25, 2010, Exhibit A); Wallach did not sign the stipulation until that evening, some seven hours later (see, e.g., Wallach Aff. ¶ 39(d); id. Exhibit W1a; Answer ¶ 10). Thus, before Wallach signed the Stipulation, the criminal case had been dismissed, and the AUSA had instructed Pretrial Services that Wallach's electronic monitoring bracelet could be removed.

Nor did Wallach proffer evidence that the government threatened to withhold his travel documents unless he signed the Stipulation. The only evidence we have seen in the record with respect to a request by Wallach for those documents is an email attached to his Affidavit showing that on Saturday July 11, a day after signing the Stipulation, Wallach asked his attorney to "get me my passports and other stuff this coming week" (Wallach Aff. Exhibit W4 (emphasis added)); his Affidavit shows that he received them on the following Wednesday (see Wallach Aff. ¶ 42).

Second, Wallach's statements that he signed the Stipulation only because his will was overborne by the government's greater bargaining power and that he had no alternative are conclusory and are contradicted by some of the more detailed statements he has made. For example, Wallach stated that prior to the dismissal of the criminal case, he and the government had been negotiating toward a resolution that apparently would have had Wallach simply accept responsibility for a minor technical Customs violation and pay a $20,000 civil fine (see, e.g., Wallach Aff. ¶¶ 35-36, 38; id. Exhibit W2, at 3); Wallach was informed by his attorney "that the stipulation was the substitute for the [civil] compromise" (Wallach Aff. ¶ 38). Wallach's attorney advised him to sign the Stipulation,

-19-

pointing out that the government had the right to "reopen the case against [Wallach] because the charges had been dismissed without prejudice" (Wallach Aff. Exhibit W2, at 4; see also Wallach Aff. ¶ 40); and Wallach signed the Stipulation on his "attorney's advice" (Wallach Email ¶ 5) "because it would end the saga" (Wallach brief on appeal at 18). And although Wallach has attempted to explain away some of the statements he made in his September 18 email to AUSA Massey, he indisputably stated in that email, "I did not have to sign" the Stipulation; "I was practically free when I did sign" (a reasonable view, considering that the criminal case had already been dismissed); and "[e]ven if I wouldn't have signed, I could have left back home" (Wallach Email ¶ 4). Wallach's own statements thus preclude a finding that his will was overborne.

Lastly, even assuming there had been a proffer of evidence adequate to permit an initial finding of duress, Wallach's claim would founder on his failure promptly to repudiate the Stipulation. According to the documents in the district court record, Wallach made no attempt to repudiate until four months after he had signed the Stipulation, attacking it for the first time in the Interest Statement he filed in this action in November 2009. And in the interim, in his September 18 unsolicited email sent to the government two months after he signed the Stipulation, Wallach stated, "I will honor what I signed." (Wallach Email ¶ 9.) Thus, far from effecting a prompt repudiation, Wallach explicitly ratified the Stipulation.

B. Wallach's Lack of Standing To Oppose Forfeiture

In order to interpose a challenge to a civil in rem forfeiture action brought by the government, a claimant must have standing within the meaning of Article III of the Constitution. See, e.g., United States v. Cambio Exacto, S.A., 166 F.3d 522, 526 (2d Cir. 1999); Forfeiture Action Rule

G(8)(b)(i). To have Article III standing, a complainant must demonstrate (1) a concrete, particularized, and "actual or imminent" injury, (2) "a causal connection between the injury and the conduct complained of," and (3) a "likel[ihood] . . . that the injury will be redressed by a favorable decision" of the court. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (internal quotation marks omitted).

Wallach has not met these requirements. As Wallach signed and ratified the Stipulation in which he agreed not to contest the forfeiture of the Jammers to the government and agreed not to assert any claim against the government with respect to its acquisition of the Jammers, the forfeiture cannot cause him injury. The district court correctly granted the government's motion to strike or for summary judgment on the ground of Wallach's lack of standing.

Finally, we note that Wallach, in his Answer in the district court, also asserted that his signing the Stipulation on behalf of Wireless could not bind Wireless because the Stipulation had not received official corporate approval. Nothing in his papers, however, serves to preserve any right that may have belonged to Wireless, for a corporation is not allowed to appear in federal court except by a licensed attorney, see, e.g., Rowland v. California Men's Colony, 506 U.S. 194, 202 (1993); and Wallach as a non-attorney is not allowed, in federal court, to represent anyone other than himself, see, e.g., 28 U.S.C. § 1654; Powerserve International, Inc. v. Lavi, 239 F.3d 508, 514 (2d Cir. 2001).

CONCLUSION

We have considered all of Wallach's contentions on this appeal and have found them to be without merit. The judgment of the district court is affirmed.